# BROWNING-FERRIS INDUSTRIES OF VERMONT, INC., ET AL. *v.* KELCO DISPOSAL, INC., ET AL.

No. 88–556.   Argued April 18, 1989—Decided June 26, 1989

BLACKMUN, J., delivered the opinion for a unanimous Court with respect to Parts I, III, and IV, and the opinion of the Court with respect to Part II, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed a concurring opinion, in which MARSHALL, J., joined, *post*, p. 280. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, *post*, p. 282.

*Andrew L. Frey* argued the cause for petitioners. With him on the briefs were *Kenneth S. Geller, Mark I. Levy, James D. Holzhauer, Andrew J. Pincus,* and *J. Paul McGrath.*

*H. Bartow Farr III* argued the cause for respondents. With him on the brief were *Joel I. Klein, Paul M. Smith, Robert B. Hemley,* and *Norman Williams.**

---

*Briefs of *amici curiae* urging reversal were filed for the city of New York by *Peter L. Zimroth, Leonard J. Koerner,* and *John Hogrogian;* for

JUSTICE BLACKMUN delivered the opinion of the Court.

We face here the questions whether the Excessive Fines Clause of the Eighth Amendment applies to a civil-jury award of punitive or exemplary damages, and, if so, whether an award of $6 million was excessive in this particular case.[1] This Court has never held, or even intimated, that the

the American National Red Cross et al. by *Rex E. Lee, Carter G. Phillips, Elizabeth H. Esty, Charles A. Rothfeld, Benjamin W. Heineman, Jr., Philip A. Lacovara,* and *Fred J. Hiestand;* for Arthur Andersen & Co. et al. by *Leonard P. Novello, Jon N. Ekdahl, Carl D. Liggio, Harris J. Amhowitz, Kenneth H. Lang,* and *Eldon Olson;* for Johnson & Higgins et al. by *George Clemon Freeman, Jr., John Calvin Jeffries, Jr.,* and *James W. Morris III;* for Merrill Lynch, Pierce, Fenner & Smith, Inc., et al. by *Louis R. Cohen, Lloyd N. Cutler, Ronald J. Greene,* and *Robert C. Dinerstein;* for Navistar International Transportation Corp. by *David A. Strauss* and *John A. Rupp;* for the Pharmaceutical Manufacturers Association et al. by *John Reese, Geoffrey Richard Wagner Smith, Richard F. Kingham,* and *Bruce N. Kuhlik;* and for the United States Chamber of Commerce et al. by *Herbert L. Fenster* and *Malcolm E. Wheeler.*

*Sherman L. Cohn* and *Jeffrey Robert White* filed a brief for the Association of Trial Lawyers of America as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the Alliance of American Insurers et al. by *Jack H. Blaine, Phillip E. Stano, Craig A. Berrington, John B. Crosby, John J. Nangle, Kenneth H. Nails, James H. Bradner, Jr., Joe W. Peel,* and *Theresa L. Sorota;* for Bethlehem Steel Corp. et al. by *Martin S. Kaufman;* for the California Trial Lawyers Association by *Joseph Remcho, Harvey R. Levine, Amy Langerman,* and *William L. Denton;* for CBS, Inc., et al. by *P. Cameron DeVore, Marshall J. Nelson, Douglas P. Jacobs, Richard M. Schmidt, R. Bruce Rich, Harvey L. Lipton,* and *Bruce W. Sanford;* for the Consumers Union of the United States et al. by *Andrew F. Popper;* for Golden Rule Insurance Co. et al. by *Darrell S. Richey, N. Douglas Martin, Jr.,* and *Thomas J. Norman;* for Goodyear Tire & Rubber Co. by *Theodore B. Olson* and *Larry L. Simms;* for the Illinois Trial Lawyers Association by *Robert J. Cooney;* for the Insurance Consumer Action Network by *Roger O'Sullivan;* for Metromedia, Inc., by *Theodore B. Olson* and *Larry L. Simms;* for the National Association of Mutual Insurance Companies by *Bert S. Nettles, Forrest S. Latta,* and *Geoffrey C. Hazard, Jr.;* and for Martha Hoffmann Sanders by *Bruce J. Ennis, Jr., Donald N. Bersoff,* and *W. Sidney Fuller.*

[1] Petitioners before this Court also challenge the award on due process grounds. For reasons set forth in Part III of this opinion, we decline to reach that issue.

Eighth Amendment serves as a check on the power of a jury to award damages in a civil case. Rather, our concerns in applying the Eighth Amendment have been with criminal process and with direct actions initiated by government to inflict punishment. Awards of punitive damages do not implicate these concerns. We therefore hold, on the basis of the history and purpose of the Eighth Amendment, that its Excessive Fines Clause does not apply to awards of punitive damages in cases between private parties.

## I

These weighty questions of constitutional law arise from an unlikely source: the waste-disposal business in Burlington, Vt. Petitioner Browning-Ferris Industries of Vermont, Inc., is a subsidiary of petitioner Browning-Ferris Industries, Inc. (collectively, BFI), which operates a nationwide commercial waste-collection and disposal business. In 1973 BFI entered the Burlington area trash-collection market, and in 1976 began to offer roll-off collection services.[2] Until 1980 BFI was the sole provider of such services in the Burlington area; that year respondent Joseph Kelley, who, since 1973, had been BFI's local district manager, went into business for himself, starting respondent Kelco Disposal, Inc. Within a year Kelco obtained nearly 40% of the Burlington roll-off market, and by 1982 Kelco's market share had risen to 43%. During 1982 BFI reacted by attempting to drive Kelco out of business, first by offering to buy Kelco and then by cutting prices by 40% or more on new business for approximately six months. The orders given to the Burlington BFI office by its regional vice president were clear: "Put [Kelley] out of business. Do whatever it takes. Squish him like a bug." App. 10. BFI's Burlington salesman was also instructed to

---

[2] "Roll-off waste collection is usually performed at large industrial locations and construction sites with the use of a large truck, a compactor, and a container that is much larger than the typical 'dumpster.'" 845 F. 2d 404, 406 (CA2 1988).

put Kelco out of business and told that if "it meant give the stuff away, give it away." *Ibid.*

During the first four months of BFI's predatory campaign, Kelco's revenues dropped 30%. Kelco's attorney wrote to BFI's legal department asserting that BFI's pricing strategy was illegal, and threatened to initiate court proceedings if it continued. BFI did not respond, and continued its price-cutting policy for several more months. BFI's market share remained stable from 1982 to 1984, but by 1985 Kelco had captured 56% of the market. That same year BFI sold out to a third party and left the Burlington market.

In 1984, Kelco and Kelley brought an action in the United States District Court for the District of Vermont, alleging a violation of § 2 of the Sherman Act for attempts to monopolize the Burlington roll-off market. They also claimed that BFI had interfered with Kelco's contractual relations in violation of Vermont tort law. Kelley's claims were severed from Kelco's, and Kelco's antitrust and tort claims were tried to a jury. After a 6-day trial BFI was found liable on both counts. A 1-day trial on damages followed, at which Kelco submitted evidence regarding the revenues and profits it lost as a result of BFI's predatory prices. Kelco's attorney urged the jury to return an award of punitive damages, asking the jurors to "deliver a message to Houston [BFI's headquarters]." *Id.*, at 53. Kelco also stressed BFI's total revenues of $1.3 billion in the previous year, noting that this figure broke down to $25 million a week. BFI urged that punitive damages were not appropriate, but made no argument as to amount.

The District Court instructed the jury that it could award punitive damages on the state-law claims if it found by clear and convincing evidence that BFI's conduct "revealed actual malice, outrageous conduct, or constituted a willful and wanton or reckless disregard of the plaintiff's rights." *Id.*, at 81. It also told the jury that in determining the amount of punitive damages it could take into account "the character of the

defendants, their financial standing, and the nature of their acts." *Ibid.* BFI raised no relevant objection to the charge on punitive damages. The jury returned a verdict of $51,146 in compensatory damages on both the federal-antitrust and state-tort counts, and $6 million in punitive damages.

BFI moved for judgment notwithstanding the verdict, a new trial, or remittitur. The District Court denied these motions and awarded Kelco $153,438 in treble damages and $212,500 in attorney's fees and costs on the antitrust claim, or, in the alternative, $6,066,082.74 in compensatory and punitive damages on the state-law claim. BFI appealed. The United States Court of Appeals for the Second Circuit affirmed the judgment both as to liability and as to damages. 845 F. 2d 404 (1988). On the issue of punitive damages, the court noted that the evidence showed that BFI "wilfully and deliberately attempted to drive Kelco out of the market," and found no indication of jury prejudice or bias. *Id.*, at 410. Addressing the Eighth Amendment issue, the court noted that even if the Amendment were applicable "to this nominally civil case," the damages were not "so disproportionate as to be cruel, unusual, or constitutionally excessive," and upheld the award. *Ibid.* Because of its importance, we granted certiorari on the punitive damages issue. 488 U. S. 980 (1988).

## II

The Eighth Amendment reads: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Although this Court has never considered an application of the Excessive Fines Clause, it has interpreted the Amendment in its entirety in a way which suggests that the Clause does not apply to a civil-jury award of punitive damages. Given that the Amendment is addressed to bail, fines, and punishments, our cases long have understood it to apply primarily, and perhaps exclusively, to criminal prosecutions and punishments. See, *e. g.*, *Ex parte Watkins*, 7 Pet. 568, 573–574 (1833) ("The eighth

amendment is addressed to courts of the United States exercising criminal jurisdiction"); *Fong Yue Ting* v. *United States,* 149 U. S. 698, 730 (1893) (Amendment inapplicable to deportation because deportation is not punishment for a crime); *Ingraham* v. *Wright,* 430 U. S. 651, 664–668 (1977). "Bail, fines, and punishment traditionally have been associated with the criminal process, and by subjecting the three to parallel limitations the text of the Amendment suggests an intention to limit the power of those entrusted with the criminal-law function of government." *Id.,* at 664.[3]

To decide the instant case, however, we need not go so far as to hold that the Excessive Fines Clause applies just to criminal cases. Whatever the outer confines of the Clause's

---

[3] *Ingraham,* like most of our Eighth Amendment cases, involved the Cruel and Unusual Punishments Clause, and it therefore is not directly controlling in this Excessive Fines Clause case. The insights into the meaning of the Eighth Amendment reached in *Ingraham* and similar cases, however, are highly instructive.

We left open in *Ingraham* the possibility that the Cruel and Unusual Punishments Clause might find application in some civil cases. See 430 U. S., at 669, n. 37. The examples we cited as possibilities—persons confined in mental or juvenile institutions—do not provide much support for petitioners' argument that the Excessive Fines Clause is applicable to a civil award of punitive damages. In any event, petitioners have not made any argument specifically based on the Cruel and Unusual Punishments Clause.

There is language in *Carlson* v. *Landon,* 342 U. S. 524, 546 (1952), suggesting that the Bail Clause may be implicated in civil deportation proceedings. The Court there held that "the Eighth Amendment does not require that bail be allowed" in such cases, but the opinion in that case never addressed the question whether the Eighth Amendment applied in civil cases: the Court held that the Bail Clause does not require Congress to provide for bail in *any* case, but prohibits only the imposition of *excessive* bail. *Carlson* provides petitioners with little support for another reason as well. Bail, by its very nature, is implicated only when there is a direct government restraint on personal liberty, be it in a criminal case or in a civil deportation proceeding. The potential for governmental abuse which the Bail Clause guards against is present in both instances, in a way that the abuses against which the Excessive Fines Clause protects are not present when a jury assesses punitive damages.

reach may be, we now decide only that it does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded. To hold otherwise, we believe, would be to ignore the purposes and concerns of the Amendment, as illuminated by its history.[4]

A

The Eighth Amendment received little debate in the First Congress, see *Weems* v. *United States*, 217 U. S. 349, 368 (1910), and the Excessive Fines Clause received even less attention. This is not surprising; at least eight of the original States which ratified the Constitution had some equivalent of the Excessive Fines Clause in their respective Declarations of Rights or State Constitutions,[5] so the matter was not a likely source of controversy or extensive discussion. Although the prohibition of excessive fines was mentioned as part of a complaint that the Amendment was unnecessary and imprecise, see 217 U. S., at 369, Congress did not discuss

[4]The same basic mode of inquiry should be applied in considering the scope of the Excessive Fines Clause as is proper in other Eighth Amendment contexts. We look to the origins of the Clause and the purposes which directed its Framers. "The applicability of the Eighth Amendment always has turned on its original meaning, as demonstrated by its historical derivation." *Ingraham*, 430 U. S., at 670–671, n. 39. We emphasize, however, that this historical emphasis concerns the question of when the Eighth Amendment is to be applied; as the Court's jurisprudence under the Cruel and Unusual Punishments Clause indicates, its approach has not relied on history to the same extent when considering the scope of the Amendment. See *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion) ("The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society").

[5]Delaware, Georgia, Maryland, Massachusetts, New Hampshire, North Carolina, Pennsylvania, and Virginia all had a Declaration of Rights or a Constitution expressly prohibiting excessive fines. See 1 B. Schwartz, The Bill of Rights: A Documentary History 235 (Virginia), 272 (Pennsylvania), 278 (Delaware), 282 (Maryland), 287 (North Carolina), 300 (Georgia), 343 (Massachusetts), and 379 (New Hampshire) (1971).

what was meant by the term "fines," or whether the prohibition had any application in the civil context. In the absence of direct evidence of Congress' intended meaning, we think it significant that at the time of the drafting and ratification of the Amendment, the word "fine" was understood to mean a payment to a sovereign as punishment for some offense.[6] Then, as now, fines were assessed in criminal, rather than in private civil, actions.[7]

---

[6] A "fine signifieth a percuniarie punishment for an offence, or a contempt committed against the king." 1 E. Coke, Institutes *126b. The second edition of Cunningham's Law-Dictionary, published in 1771, defined "fines for offences" as "amends, pecuniary punishment, or recompence for an offence committed against the King and his laws, or against the Lord of a manor." 2 T. Cunningham, A New and Complete Law-Dictionary (unpaginated). See also 1 T. Tomlins, Law-Dictionary 796–799 (1836) (same); 1 J. Bouvier, Law Dictionary 525 (4th ed. 1852) (same).

[7] Petitioners have come forward with no evidence, or argument, which convinces us that the word "fine," as used in the late 18th century, would have encompassed private civil damages of any kind. Indeed, the term "damages" was also in use at the time the Eighth Amendment was drafted and ratified, and had a precise meaning limited to the civil context. Cunningham defined damages as follows: "in the Common law it is a part of what the jurors are to inquire of, and bring in, when an action passeth for the plaintiff: . . . [Damages] comprehend a recompence for what the plaintiff or demandant hath suffered, by means of the wrong done to him by the defendant or tenant." 1 Cunningham, *supra;* see also 1 Tomlins, at 498 (same); 1 Bouvier, at 360 (same). The dichotomy between fines and damages was clear.

There have been cases which have used the word "fine" to refer to civil damages assessed by statute. As the partial dissent notes, two cases decided 70 years after the Excessive Fines Clause was adopted considered the term "fines" to include money, recovered in a civil suit, which was paid to government. See *Hanscomb* v. *Russell*, 77 Mass. 373, 375 (1858); *Gosselink* v. *Campbell*, 4 Iowa 296 (1856). These cases, however, provide no support for petitioners' argument that the Eighth Amendment is applicable in cases between private parties. As to the partial dissent's reliance on the Bard, *post*, at 290, we can only observe:

Though Shakespeare, of course,
Knew the Law of his time,
He was foremost a poet,
In search of a rhyme.

But there is more than inferential evidence from language to support our conclusion that the Excessive Fines Clause is inapplicable to an award of punitive damages. The undisputed purpose and history of the Amendment generally, and of the Excessive Fines Clause specifically, confirm our reading. The Eighth Amendment clearly was adopted with the particular intent of placing limits on the powers of the new Government. "At the time of its ratification, the original Constitution was criticized in the Massachusetts and Virginia Conventions for its failure to provide any protection for persons convicted of crimes. This criticism provided the impetus for inclusion of the Eighth Amendment in the Bill of Rights." *Ingraham* v. *Wright*, 430 U. S., at 666 (footnote omitted). See generally *Barron* v. *Mayor and City Council of Baltimore*, 7 Pet. 243, 250 (1833) ("In almost every convention by which the constitution was adopted, amendments to guard against the abuse of power were recommended"); *Weems* v. *United States*, 217 U. S., at 372 (the "predominant political impulse" of proponents of the Bill of Rights "was distrust of power, and they insisted on constitutional limitations against its abuse"). Simply put, the primary focus of the Eighth Amendment was the potential for governmental abuse of its "prosecutorial" power, not concern with the extent or purposes of civil damages.

Moreover, specific and persuasive support for our reading of the Excessive Fines Clause comes from the pedigree of the Clause itself. As we have noted in other cases, it is clear that the Eighth Amendment was "based directly on Art I, §9, of the Virginia Declaration of Rights," which "adopted verbatim the language of the English Bill of Rights." *Solem* v. *Helm*, 463 U. S. 277, 285, n. 10 (1983). Section 10 of the English Bill of Rights of 1689, like our Eighth Amendment, states that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted." 1 Wm. & Mary, 2d Sess., ch. 2, 3 Stat. at Large

440, 441 (1689). We recounted in *Ingraham*, 430 U. S., at 664: "The English version, adopted after the accession of William and Mary, was intended to curb the excesses of English judges under the reign of James II." During the reigns of the Stuarts the King's judges had imposed heavy fines on the King's enemies, much as the Star Chamber had done before its abolition in 1641. L. Schwoerer, The Declaration of Rights, 1689, p. 91 (1981). In the 1680's the use of fines "became even more excessive and partisan," and some opponents of the King were forced to remain in prison because they could not pay the huge monetary penalties that had been assessed. *Ibid.*[8] The group which drew up the 1689 Bill of Rights had firsthand experience; several had been subjected to heavy fines by the King's bench. *Id.*, at 91–92, and n. 198.

The Framers of our Bill of Rights were aware and took account of the abuses that led to the 1689 Bill of Rights.[9] This history, when coupled with the fact that the accepted English definition of "fine" in 1689 appears to be identical to that in use in colonial America at the time of our Bill of Rights,[10] seems to us clear support for reading our Excessive Fines Clause as limiting the ability of the sovereign to use its prosecutorial power, including the power to collect fines, for improper ends. Providing even clearer support for this view is the English case law, immediately prior to the enactment of

---

[8] For particular examples, see the 1683 *Trial of Thomas Pilkington, and others, for a Riot,* 9 State Tr. 187, and the 1684 *Trial of Sir Samuel Barnardiston,* 9 State Tr. 1333.

[9] Justice Story was of the view that the Eighth Amendment was "adopted as an admonition to all departments of the national government, to warn them against such violent proceedings as had taken place in England in the arbitrary reigns of some of the Stuarts." 2 J. Story, Commentaries on the Constitution of the United States 624 (T. Cooley 4th ed. 1873).

[10] By 1689, the definition of "fines" and "damages" discussed in nn. 6 and 7, *supra*, already had taken hold. For a definition of "damages," see T. Blount, A Law-Dictionary (1670) (unpaginated).

the English Bill of Rights, which stressed the difference between civil damages and criminal fines. See *Lord Townsend* v. *Hughes*, 2 Mod. 150, 86 Eng. Rep. 994 (C. P. 1677). In short, nothing in English history suggests that the Excessive Fines Clause of the 1689 Bill of Rights, the direct ancestor of our Eighth Amendment, was intended to apply to damages awarded in disputes between private parties. Instead, the history of the Eighth Amendment convinces us that the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government.

## B

Petitioners, however, argue that the Excessive Fines Clause "derives from limitations in English law on monetary penalties exacted in private civil cases to punish and deter misconduct." Brief for Petitioners 17. They recognize that nothing in the history we have recounted thus far espouses that view. To find support, they turn the clock hundreds of years further back to English history prior to Magna Carta, and in particular to the use and abuse of "amercements." According to petitioners, amercements were essentially civil damages, and the limits Magna Carta placed on the use of amercements were the forerunners of the 1689 Bill of Rights' prohibition on excessive fines. In their view, the English Bill of Rights and our Eighth Amendment must be understood as reaching beyond the criminal context, because Magna Carta did. Punitive damages, they suggest, must be within the scope of the Excessive Fines Clause because they are a modern-day analog of 13th-century amercements.

The argument is somewhat intriguing, but we hesitate to place great emphasis on the particulars of 13th-century English practice, particularly when the interpretation we are urged to adopt appears to conflict with the lessons of more recent history. Even so, our understanding of the use of amercements, and the development of actions for damages at

common law, convince us that petitioners' view of the relevant history does not support the result they seek.

Amercements were payments to the Crown, and were required of individuals who were "in the King's mercy," because of some act offensive to the Crown. Those acts ranged from what we today would consider minor criminal offenses, such as breach of the King's peace with force and arms, to "civil" wrongs against the King, such as infringing "a final concord" made in the King's court. See 2 F. Pollock & F. Maitland, History of English Law 519 (2d ed. 1905) (Pollock & Maitland); see also *Solem* v. *Helm,* 463 U. S., at 284, n. 8 (an amercement "was the most common criminal sanction in 13th-century England"); W. McKechnie, Magna Carta 285–286 (2d ed. 1958) (McKechnie) (discussing amercements as a step in the development of criminal law). Amercements were an "all-purpose" royal penalty; they were used not only against plaintiffs who failed to follow the complex rules of pleading [11] and against defendants who today would be liable in tort, but also against an entire township which failed to live up to its obligations, or against a sheriff who neglected his duties. [12] The use of amercements was widespread; one commentary has said that most men in England could expect

---

[11] See Treatise on the Laws and Customs of the Realm of England Commonly called Glanvill 127–128 (G. Hall ed. 1965) (written between 1187–1189); Introduction to the Curia Regis Rolls, 1199–1230 A. D., in 62 Publications of the Selden Society 465 (C. Flower ed. 1944). Defendants could be amerced as well. "The justices did not hesitate to extract amercements from both parties when the occasion arose." *Id.,* at 466. For a wide variety of conduct for which amercements were assessed on parties, see *Beecher's Case,* 8 Co. Rep. 58a, 59b–60a, 77 Eng. Rep. 559, 564–565 (Ex. 1609); 1 Select Pleas of the Crown (A. D. 1200–1225), in 1 Publications of the Selden Society 2, 4, 5–6, 7–8, 9–10, 13, 43–44, 90 (F. Maitland ed. 1888); 62 Selden Society, at 464–467.

[12] See *id.,* at 467; Pleas of the Crown for the County of Gloucester: A. D. 1221, p. xxxiii (F. Maitland ed. 1884) (Pleas for Gloucester); see generally 1 Selden Society.

to be amerced at least once a year.    See 2 Pollock & Maitland 513.[13]

In response to the frequent, and occasionally abusive, use of amercements by the King, Magna Carta included several provisions placing limits on the circumstances under which a person could be amerced, and the amount of the amercement.[14]    The barons who forced John to agree to Magna Carta sought to reduce arbitrary royal power, and in particu-

---

[13] Without discussing the complex origins of civil damages in detail, see 2 Pollock & Maitland 522–525; 62 Selden Society, at 473–479, we can say confidently that damages and amercements were not the same.    In the time before Magna Carta, damages awards were rare, 2 Pollock & Maitland 523, the more usual relief being a fixed monetary payment or specific relief.    But "[t]he distinction between amercements and damages is well known.    The former were payable to the crown after legal action or for an error or ineptitude which took place in its course; the latter represented the loss incurred by a litigant through an unlawful act.    They were payable to [the private litigant]."    62 Selden Society, at 463.

The only overlap between the two might occur in the Assize of Novel Disseisin, in which the court could grant the recovery of land and chattels, and might amerce the defendant as well.    Id., at 156; see generally 2 Pollock & Maitland 44–56, 523–524.    But even in this action, the amerciable offense is one to the Crown, for every disseisin was a breach of the peace, as well as an improper possession of another's property.    Id., at 44.    Along these lines, see 62 Selden Society, at 478–479 ("In comparison with amercements, damages were seldom remitted, for the good reason that the king could do as he liked with his own but had to be careful not to show mercy at the expense of a wronged subject").

[14] "A Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement; (2) and a Merchant likewise, saving to him his Merchandise; (3) and any other's villain than ours shall be likewise amerced, saving his wainage, if he falls into our mercy.    (4) And none of the said amerciaments shall be assessed, but by the oath of honest and lawful men of the vicinage.    (5) Earls and Barons shall not be amerced but by their Peers, and after the manner of their offence.    (6) No man of the Church shall be amerced after the quantity of his spiritual Benefice, but after his Lay-tenement, and after the quantity of his offence."    Magna Charta, 9 Hen. III, ch. 14 (1225), 1 Stat. at Large 5 (1769), confirmed, 25 Edw. I, ch. 1 (1297), id., at 131–132.

lar to limit the King's use of amercements as a source of royal revenue, and as a weapon against enemies of the Crown.[15] The Amercements Clause of Magna Carta limited these abuses in four ways: by requiring that one be amerced only for some genuine harm to the Crown; by requiring that the amount of the amercement be proportioned to the wrong; by requiring that the amercement not be so large as to deprive him of his livelihood; and by requiring that the amount of the amercement be fixed by one's peers, sworn to amerce only in a proportionate amount.[16]

Petitioners, and some commentators,[17] find in this history a basis for concluding that the Excessive Fines Clause operates to limit the ability of a civil jury to award punitive damages. We do not agree. Whatever uncertainties surround the use of amercements prior to Magna Carta, the compact signed at Runnymede was aimed at putting limits on the

---

[15] See generally McKechnie 278; G. Smith, A Constitutional and Legal History of England 129, 131 (1955). Although most amercements were not large, see McKechnie 287; 2 Pollock & Maitland 513, being placed in the King's mercy meant, at least theoretically, that a man's estate was in the King's hands, and it was within the King's power to require its forfeit. See 62 Selden Society, at 463; McKechnie 71–72 (one called to the King's service who did not go was in mercy, and his estate was subject to forfeiture). Amercements also resembled a form of taxation, particularly when used against entire townships. See Pleas for Gloucester xxxiv.

[16] According to Pollock and Maitland, after the court found a person to be in the King's mercy, and that person obtained a pledge for the payment of whatever sum was to be amerced, the court would go on to other cases. At this point the person had not yet been amerced. "At the end of the session some good and lawful men, the peers of the offender (two seem to be enough) were sworn to 'affeer' the amercements. They set upon each offender some fixed sum of money that he was to pay; this sum is his amercement." 2 Pollock & Maitland 513; see also Pleas for Gloucester xxxiv. This procedure indicates that amercements were assessed by a "jury" different from that which considered the case.

[17] See, e. g., Massey, The Excessive Fines Clause and Punitive Damages: Some Lessons from History, 40 Vand. L. Rev. 1233 (1987); Note, The Constitutionality of Punitive Damages Under the Excessive Fines Clause of the Eighth Amendment, 85 Mich. L. Rev. 1699 (1987).

power of the King, on the "tyrannical extortions, under the name of amercements, with which John had oppressed his people," T. Taswell-Langmead, English Constitutional History 83 (T. Plucknett 10th ed. 1946), whether that power be exercised for purposes of oppressing political opponents, for raising revenue in unfair ways, or for any other improper use. See 2 W. Holdsworth, A History of English Law 214 (4th ed. 1936). These concerns are clearly inapposite in a case where a private party receives exemplary damages from another party, and the government has no share in the recovery. Cf. *United States* v. *Halper,* 490 U. S. 435 (1989) (Double Jeopardy Clause).

Petitioners ultimately rely on little more than the fact that the distinction between civil and criminal law was cloudy (and perhaps nonexistent) at the time of Magna Carta. But any overlap between civil and criminal procedure at that time does nothing to support petitioners' case, when all the indications are that English courts never have understood the amercements clauses to be relevant to private damages of any kind, either then or at any later time. See *Lord Townsend* v. *Hughes,* 2 Mod., at 151, 86 Eng. Rep., at 994–995 (Magna Carta's amercements provisions apply in criminal, but not civil, cases). Even after the common law had developed to the point where courts occasionally did decrease a damages award or eliminate it altogether, such action was never predicated on the theory that the *government* somehow had overstepped its bounds. Rather, the perceived error was one made by the jury, as determined by reference to common-law, rather than constitutional, standards. Whether based on reasoning that the jury's award was so excessive that it must have been based on bias or prejudice, see *Wood* v. *Gunston,* Sty. 466, 82 Eng. Rep. 867 (K. B. 1655); *Leith* v. *Pope,* 2 Bl. W. 1327, 96 Eng. Rep. 777 (C. P. 1780), or that the jury must have misconstrued the evidence, see *Ash* v. *Ash,* Comb. 357, 90 Eng. Rep. 526 (1696), the proper focus was, and still is, on the behavior of the jury. It is diffi-

cult to understand how Magna Carta, or the English Bill of Rights as viewed through the lens of Magna Carta, compels us to read our Eighth Amendment's Excessive Fines Clause as applying to punitive damages when those documents themselves were never so applied.[18]

## C

Our conclusion that the Framers of the Eighth Amendment did not expressly intend it to apply to damages awards made by civil juries does not necessarily complete our inquiry. Our Eighth Amendment jurisprudence has not been inflexible. The Court, when considering the Eighth Amendment, has stated: "Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is particularly true of constitutions." *Weems* v. *United States*, 217 U. S., at 373.[19] This aspect

---

[18] So, for example, when the House of Lords placed certain limits on the types of cases in which exemplary damages could be awarded, Lord Devlin's extensive discussion mentioned neither Magna Carta or the Excessive Fines Clause of the 1689 Bill of Rights, nor did it suggest that English constitutional or common law placed any restrictions on the award of exemplary damages other than those discussed above. *Rookes* v. *Barnard*, [1964] A. C. 1129, 1221–1231. In fact, Lord Devlin recognized that his suggested alterations were a departure from the traditional common-law view. *Id.*, at 1226. We find it significant that other countries that share an English common-law heritage have not followed the decision in *Rookes*, and continue to allow punitive or exemplary damages to be awarded without substantial interference. See, *e. g.*, *Uren* v. *John Fairfax & Sons*, [1967] A. L. R. 25, 27 (Australia) (declining to follow *Rookes*); *Bahner* v. *Marwest Hotel Co.*, 6 D. L. R. 3d 322, 329 (1969) (Canada) (same); *Fogg* v. *McKnight*, [1968] N. Z. L. R. 330, 333 (New Zealand) (same).

[19] In *Weems*, Justice McKenna continued his writing for the Court: "[Constitutions] are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, 'designed to approach immortality as nearly as human institutions can approach it.' The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution,

of our Eighth Amendment jurisprudence might have some force here were punitive damages a strictly modern creation, without solid grounding in pre-Revolutionary days. But the practice of awarding damages far in excess of actual compensation for quantifiable injuries was well recognized at the time the Framers produced the Eighth Amendment. Awards of double or treble damages authorized by statute date back to the 13th century, see Statute of Gloucester, 1278, 6 Edw. I, ch. 5, 1 Stat. at Large 66 (treble damages for waste); see also 2 Pollock & Maitland 522, and the doctrine was expressly recognized in cases as early as 1763.[20] Despite this recognition of civil exemplary damages as puni-

---

therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality." 217 U. S., at 373.

[20] Among the first cases to make explicit reference to exemplary damages was *Huckle* v. *Money*, 2 Wils. 205, 95 Eng. Rep. 768 (K. B. 1763), where the court refused to set aside a jury award of £300 where the plaintiff's injury would have been compensated by £20. Upholding what it referred to as an award of "exemplary damages," the court noted that "the law has not laid down what shall be the measure of damages in actions of tort; the measure is vague and uncertain, depending on a vast variety of causes, facts, and circumstances," and declined to "intermeddle" in the damages determination. "[I]t must be a glaring case indeed of outrageous damages in a tort, and which all mankind at first blush must think so, to induce a Court to grant a new trial for excessive damages." *Id.*, at 206–207, 95 Eng. Rep., at 768–769. Another case decided that year stated the applicable principle with particular clarity: "Damages are designed not only as a satisfaction to the injured person, but likewise as punishment to the guilty, to deter from any such proceeding for the future and as a proof of the detestation of the jury to the action itself." *Wilkes* v. *Wood*, Lofft 1, 18–19, 98 Eng. Rep. 489, 498–499 (K. B.). Other English cases followed a similar approach. See, *e. g.*, *Roe* v. *Hawkes*, 1 Lev. 97, 83 Eng. Rep. 316 (K. B. 1663); *Grey* v. *Grant*, 2 Wils. 252, 253, 95 Eng. Rep. 794, 795 (K. B. 1764); *Benson* v. *Frederick*, 3 Burr. 1846, 97 Eng. Rep. 1130 (K. B. 1766).

tive in nature, the Eighth Amendment did not expressly include it within its scope. Rather, as we earlier have noted, the text of the Amendment points to an intent to deal only with the prosecutorial powers of government.

Furthermore, even if we were prepared to extend the scope of the Excessive Fines Clause beyond the context where the Framers clearly intended it to apply, we would not be persuaded to do so with respect to cases of punitive damages awards in private civil cases, because they are too far afield from the concerns that animate the Eighth Amendment. We think it clear, from both the language of the Excessive Fines Clause and the nature of our constitutional framework, that the Eighth Amendment places limits on the steps a government may take against an individual, whether it be keeping him in prison, imposing excessive monetary sanctions, or using cruel and unusual punishments. The fact that punitive damages are imposed through the aegis of courts and serve to advance governmental interests is insufficient to support the step petitioners ask us to take. While we agree with petitioners that punitive damages advance the interests of punishment and deterrence, which are also among the interests advanced by the criminal law, we fail to see how this overlap requires us to apply the Excessive Fines Clause in a case between private parties. Here the government of Vermont has not taken a positive step to punish, as it most obviously does in the criminal context, nor has it used the civil courts to extract large payments or forfeitures for the purpose of raising revenue or disabling some individual.[21] We shall not ignore the language of the Exces-

---

[21] In *United States* v. *Halper*, 490 U. S. 435 (1989), we held that the Double Jeopardy Clause of the Fifth Amendment places limits on the amounts the Federal Government may recover in a civil action, after the defendant already has been punished through the criminal process. While our opinion in *Halper* implies that punitive damages awarded to the Government in a civil action may raise Eighth Amendment concerns, that case is materially different from this one, because there the *Government* was exacting punishment in a civil action, whereas here the damages were

sive Fines Clause, or its history, or the theory on which it is based, in order to apply it to punitive damages.[22]

## III

Petitioners also ask us to review the punitive damages award to determine whether it is excessive under the Due Process Clause of the Fourteenth Amendment. The parties agree that due process imposes some limits on jury awards of punitive damages, and it is not disputed that a jury award may not be upheld if it was the product of bias or passion, or if it was reached in proceedings lacking the basic elements of fundamental fairness. But petitioners make no claim that the proceedings themselves were unfair, or that the jury was biased or blinded by emotion or prejudice. Instead, they seek further due process protections, addressed directly to the size of the damages award. There is some authority in our opinions for the view that the Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory scheme, see, *e. g.*, *St. Louis, I. M. & S. R. Co.* v. *Williams*, 251 U. S. 63, 66–67 (1919), but we have never addressed the precise question presented here:

awarded to a private party. We noted in *Halper* that nothing in our opinion "precludes a *private* party from filing a civil suit seeking damages for conduct that previously was the subject of criminal prosecution and punishment. The protections of the Double Jeopardy Clause are not triggered by litigation between private parties." *Id.*, at 451 (emphasis added). We left open the question whether a *qui tam* action, in which a private party brings suit in the name of the United States and shares in any award of damages, would implicate the Double Jeopardy Clause. *Id.*, at 451, n. 11. We leave the same question open for purposes of the Eighth Amendment's Excessive Fines Clause.

[22] Because of the result we reach today, we need not answer several questions that otherwise might be necessarily antecedent to finding the Eighth Amendment's Excessive Fines Clause applicable to an award of punitive damages, and that have not been briefed by the parties. We shall not decide whether the Eighth Amendment's prohibition on excessive fines applies to the several States through the Fourteenth Amendment, nor shall we decide whether the Eighth Amendment protects corporations as well as individuals.

whether due process acts as a check on undue jury discretion to award punitive damages in the absence of any express statutory limit. See *Bankers Life & Casualty Co.* v. *Crenshaw*, 486 U. S. 71, 87 (1988) (O'CONNOR, J., concurring in part and concurring in judgment). That inquiry must await another day. Because petitioners failed to raise their due process argument before either the District Court or the Court of Appeals, and made no specific mention of it in their petition for certiorari in this Court, we shall not consider its effect on this award.[23]

## IV

Petitioners also ask us to hold that this award of punitive damages is excessive as a matter of federal common law. Rather than directing us to a developed body of federal law,

---

[23] Petitioners claim that the due process question is within the "clear intendment" of the objection it has made throughout these proceedings. Our review of the proceedings in the District Court and the Court of Appeals shows that petitioners' primary claim in both of those courts was that the punitive damages award violated Vermont state law. Petitioners also argued that the award violated the Eighth Amendment. We fail to see how the claim that the award violates due process is necessarily a part of these arguments. We shall not assume that a nonconstitutional argument also includes a constitutional one, and shall not stretch the specific claims made under the Eighth Amendment to cover those that might arise under the Due Process Clause as well. Although in particular cases we have applied the doctrine petitioners advance, see *Braniff Airways, Inc.* v. *Nebraska Bd. of Equalization and Assessment,* 347 U. S. 590, 598–599 (1954), this is not a case where a respondent is making arguments in support of a judgment. See *Revere* v. *Massachusetts General Hospital,* 463 U. S. 239, 244, n. 6 (1983); *Dandridge* v. *Williams,* 397 U. S. 471, 475–476, n. 6 (1970). In the absence of a developed record on the issues relevant to this due process inquiry, we shall not stretch the "clear intendment" doctrine to include this case, as we do not think that the due process question is "only an enlargement" of the Eighth Amendment inquiry. Although the due process analysis of an award of punitive damages may track closely the Eighth Amendment analysis suggested by petitioners, we shall not assume that to be the case and shall not attempt to decide the question in the absence of a record on the due process point developed in the District Court and the Court of Appeals.

however, they merely repeat the standards they urged us to adopt under the Eighth Amendment. It is not our role to review directly the award for excessiveness, or to substitute our judgment for that of the jury. Rather, our only inquiry is whether the Court of Appeals erred in finding that the District Court did not abuse its discretion in refusing to grant petitioners' motion, under Federal Rule of Civil Procedure 59, for a new trial or remittitur. Applying proper deference to the District Court, the award of punitive damages should stand.

Review of the District Court's order involves questions of both state and federal law. In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law.[24] Fed-

---

[24] The law of punitive damages in Vermont is typical of the law in most American jurisdictions. The doctrine has long standing. As far back as 1862, the Supreme Court of Vermont noted that the law on exemplary damages was "long settled in this state." *Nye* v. *Merriam*, 35 Vt. 438, 446. A Vermont jury may award punitive damages only if the evidence supports a finding that the defendant acted with malice, see, *e. g., Appropriate Technology Corp.* v. *Palma*, 146 Vt. 643, 647, 508 A. 2d 724, 726 (1986), or "malice or wantonness shown by the act," *Rogers* v. *Bigelow*, 90 Vt. 41, 49, 96 A. 417, 420 (1916). Punitive damages awards may be set aside if grossly and manifestly excessive. See *Glidden* v. *Skinner*, 142 Vt. 644, 648, 458 A. 2d 1142, 1145 (1983). The Vermont Supreme Court has declined to adopt a rule of proportionality between compensatory and punitive damages, *Pezzano* v. *Bonneau*, 133 Vt. 88, 92, 329 A. 2d 659, 661 (1974), but does not allow punitive damages to stand when an award of compensatory damages has been vacated, *Allard* v. *Ford Motor Credit Co.*, 139 Vt. 162, 164, 422 A. 2d 940, 942 (1980). Once a plaintiff has presented sufficient evidence of malice, evidence of "'the defendant's pecuniary ability may be considered in order to determine what would be a just punishment for him.'" *Lent* v. *Huntoon*, 143 Vt. 539, 550, 470 A. 2d 1162, 1170 (1983), quoting *Kidder* v. *Bacon*, 74 Vt. 263, 274, 52 A. 322, 324 (1902).

The $6 million in punitive damages in this case apparently is the largest such judgment in the history of Vermont; there have been other substan-

eral law, however, will control on those issues involving the proper review of the jury award by a federal district court and court of appeals. See *Donovan* v. *Penn Shipping Co.*, 429 U. S. 648, 649–650 (1977); see also 6A J. Moore, J. Lucas, & G. Grotheer, Moore's Federal Practice, ¶ 59.04[1] (2d ed. 1987).

In reviewing an award of punitive damages, the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The court of appeals should then review the district court's determination under an abuse-of-discretion standard.[25] Although petitioners and their *amici* would like us to craft some common-law standard of excessiveness that relies on notions of proportionality between punitive and compensatory damages, or makes reference to statutory penalties for similar conduct, these are matters of state, and not federal, common law. Adopting a rule along the lines petitioners suggest would require us to ignore the distinction between the state-law and federal-law issues. For obvious reasons we decline that invitation.

In performing the limited function of a federal appellate court, we perceive no federal common-law standard, or com-

_____

tial jury awards, however, in the State. See, *e. g.*, *Coty* v. *Ramsey Associates, Inc.*, 149 Vt. 451, 546 A. 2d 196 ($380,000 in punitive damages), cert. denied, 487 U. S. 1236 (1988).

[25] We have never held expressly that the Seventh Amendment allows appellate review of a district court's denial of a motion to set aside an award as excessive. Although we granted certiorari in two cases in order to consider the issue, in both instances we found it unnecessary to reach the question when we decided the case. See *Neese* v. *Southern R. Co.*, 350 U. S. 77 (1955) (even assuming appellate review power under the Seventh Amendment, Court of Appeals was not justified in reversing denial of new trial on the particular facts of the case); *Grunenthal* v. *Long Island R. Co.*, 393 U. S. 156, 158 (1968) (same). In light of the result we reach today, we follow the same course here.

pelling federal policy, which convinces us that we should not continue to accord considerable deference to a district court's decision not to order a new trial.[26]  In this case the District Court properly instructed the jury on Vermont law, see n. 24, *supra*, and applied the proper state-law standard in considering whether the verdict returned was excessive. Although the opinion of the Court of Appeals is not clear to us as to whether it applied state or federal law in reviewing the District Court's order denying the new trial or remittitur, we are convinced that its conclusion that there was no abuse of discretion by the District Court is consistent with federal standards, in light of the broad range of factors Vermont law permits juries to consider in awarding punitive damages.

## V

In sum, we conclude that neither federal common law nor the Excessive Fines Clause of the Eighth Amendment provides a basis for disturbing the jury's punitive damages award in this case.  Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring.

I join the Court's opinion on the understanding that it leaves the door open for a holding that the Due Process Clause constrains the imposition of punitive damages in civil cases brought by private parties.  See *ante*, at 276–277.

Several of our decisions indicate that even where a statute sets a range of possible civil damages that may be awarded to a private litigant, the Due Process Clause forbids damages awards that are "grossly excessive," *Waters-Pierce Oil Co.* v.

---

[26] This is particularly true because the federal courts operate under the strictures of the Seventh Amendment.  As a result, we are reluctant to stray too far from traditional common-law standards, or to take steps which ultimately might interfere with the proper role of the jury.

*Texas*, 212 U. S. 86, 111 (1909), or "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable," *St. Louis, I. M. & S. R. Co.* v. *Williams*, 251 U. S. 63, 66–67 (1919). See also *Southwestern Telegraph & Telephone Co.* v. *Danaher*, 238 U. S. 482, 491 (1915); *Missouri Pacific R. Co.* v. *Humes*, 115 U. S. 512, 522–523 (1885). I should think that, if anything, our scrutiny of awards made without the benefit of a legislature's deliberation and guidance would be less indulgent than our consideration of those that fall within statutory limits.

Without statutory (or at least common-law) standards for the determination of how large an award of punitive damages is appropriate in a given case, juries are left largely to themselves in making this important, and potentially devastating, decision. Indeed, the jury in this case was sent to the jury room with nothing more than the following terse instruction: "In determining the amount of punitive damages, . . . you may take into account the character of the defendants, their financial standing, and the nature of their acts." App. 81. Guidance like this is scarcely better than no guidance at all. I do not suggest that the instruction itself was in error; indeed, it appears to have been a correct statement of Vermont law. The point is, rather, that the instruction reveals a deeper flaw: the fact that punitive damages are imposed by juries guided by little more than an admonition to do what they think is best. Because "'[t]he touchstone of due process is protection of the individual against arbitrary action of government,'" *Daniels* v. *Williams*, 474 U. S. 327, 331 (1986), quoting *Wolff* v. *McDonnell*, 418 U. S. 539, 558 (1974), I for one would look longer and harder at an award of punitive damages based on such skeletal guidance than I would at one situated within a range of penalties as to which responsible officials had deliberated and then agreed.

Since the Court correctly concludes that Browning-Ferris' challenge based on the Due Process Clause is not properly

before us, however, I leave fuller discussion of these matters for another day.

JUSTICE O'CONNOR, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

Awards of punitive damages are skyrocketing. As recently as a decade ago, the largest award of punitive damages affirmed by an appellate court in a products liability case was $250,000. See Owen, Punitive Damages in Products Liability Litigation, 74 Mich. L. Rev. 1257, 1329–1332 (1976). Since then, awards more than 30 times as high have been sustained on appeal. See *Ford Motor Co.* v. *Durrill*, 714 S. W. 2d 329 (Tex. App. 1986) ($10 million); *Ford Motor Co.* v. *Stubblefield*, 171 Ga. App. 331, 319 S. E. 2d 470 (1984) ($8 million); *Palmer* v. *A. H. Robins Co.*, 684 P. 2d 187 (Colo. 1984) ($6.2 million). The threat of such enormous awards has a detrimental effect on the research and development of new products. Some manufacturers of prescription drugs, for example, have decided that it is better to avoid uncertain liability than to introduce a new pill or vaccine into the market. See, *e. g.*, Brief for Pharmaceutical Manufacturers Association et. al. as *Amici Curiae* 5–23. Similarly, designers of airplanes and motor vehicles have been forced to abandon new projects for fear of lawsuits that can often lead to awards of punitive damages. See generally P. Huber, Liability: The Legal Revolution and Its Consequences 152–171 (1988).

The trend toward multimillion dollar awards of punitive damages is exemplified by this case. A Vermont jury found that Browning-Ferris Industries, Inc. (BFI), tried to monopolize the Burlington roll-off waste disposal market and interfered with the contractual relations of Kelco Disposal, Inc. (Kelco). The jury awarded Kelco $51,000 in compensatory damages (later trebled) on the antitrust claim, and over $6 million in punitive damages. The award of punitive damages was 117 times the actual damages suffered by Kelco and far exceeds the highest reported award of punitive damages affirmed by a Vermont court. Cf. *Coty* v. *Ramsey Associates,*

*Inc.*, 149 Vt. 451, 546 A. 2d 196 (punitive damages of $380,000 based on compensatory damages of $187,500), cert. denied, 487 U. S. 1236 (1988).

The Court holds today that the Excessive Fines Clause of the Eighth Amendment places no limits on the amount of punitive damages that can be awarded in a suit between private parties. That result is neither compelled by history nor supported by precedent, and I therefore respectfully dissent from Part II of the Court's opinion. I do, however, agree with the Court that no due process claims—either procedural or substantive—are properly presented in this case, and that the award of punitive damages here should not be overturned as a matter of federal common law. I therefore join Parts I, III, and IV of the Court's opinion. Moreover, I share JUSTICE BRENNAN's view, *ante*, at 280–282, that nothing in the Court's opinion forecloses a due process challenge to awards of punitive damages or the method by which they are imposed, and I adhere to my comments in *Bankers Life & Casualty Co.* v. *Crenshaw*, 486 U. S. 71, 86–89 (1988) (opinion concurring in part and concurring in judgment), regarding the vagueness and procedural due process problems presented by juries given unbridled discretion to impose punitive damages.

## I

Before considering the merits of BFI's Eighth Amendment claim, two preliminary questions must be addressed. First, does the Excessive Fines Clause apply to the States through the Due Process Clause of the Fourteenth Amendment? Second, is a corporation such as BFI protected by the Excessive Fines Clause?

## A

The award of punitive damages against BFI was based on Vermont law. See 845 F. 2d 404, 409 (CA2 1988). Almost 100 years ago, the Court held that the Eighth Amendment did not apply to the States. See *O'Neil* v. *Vermont*, 144 U. S. 323, 332 (1892). See also *Pervear* v. *Commonwealth*,

5 Wall. 475 (1867). But 13 years before *O'Neil,* the Court had applied the Eighth Amendment's ban on cruel and unusual punishments to a Territory. See *Wilkerson* v. *Utah,* 99 U. S. 130 (1879) (holding that execution by firing squad was not prohibited by the Eighth Amendment). In *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 462 (1947), the Court assumed, without deciding, that the Eighth Amendment applied to the States. Any confusion created by *O'Neil, Wilkerson,* and *Francis* was eliminated in *Robinson* v. *California,* 370 U. S. 660, 666–667 (1962), in which the Court, albeit without discussion, reversed a state conviction for the offense of narcotics addiction as constituting cruel and unusual punishment and being repugnant to the Fourteenth Amendment. Since *Robinson,* the Cruel and Unusual Punishments Clause has been regularly applied to the States, most notably in the capital sentencing context. In addition, the Court has assumed that the Excessive Bail Clause of the Eighth Amendment applies to the States. See *Schilb* v. *Kuebel,* 404 U. S. 357, 365 (1971). I see no reason to distinguish one Clause of the Eighth Amendment from another for purposes of incorporation, and would hold that the Excessive Fines Clause also applies to the States.

## B

In the words of Chief Justice Marshall, a corporation is "an artificial being, invisible, intangible, and existing only in contemplation of law." *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 636 (1819). As such, it is not entitled to "'purely personal' guarantees" whose "'historic function' . . . has been limited to the protection of individuals." *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 779, n. 14 (1978). Thus, a corporation has no Fifth Amendment privilege against self-incrimination, *Wilson* v. *United States,* 221 U. S. 361 (1911), or right to privacy, *United States* v. *Morton Salt Co.,* 338 U. S. 632 (1950). On the other hand, a corporation has a First Amendment right to freedom

of speech, *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), and cannot have its property taken without just compensation, *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104 (1978). A corporation is also protected from unreasonable searches and seizures, *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307 (1978), and can plead former jeopardy as a bar to a prosecution, *United States* v. *Martin Linen Supply Co.*, 430 U. S. 564 (1977). Furthermore, a corporation is entitled to due process, *Helicopteros Nacionales de Colombia* v. *Hall*, 466 U. S. 408 (1984), and equal protection, *Metropolitan Life Ins. Co.* v. *Ward*, 470 U. S. 869 (1985), of law.

Whether a particular constitutional guarantee applies to corporations "depends on the nature, history, and purpose" of the guarantee. *First National Bank of Boston, supra,* at 779, n. 14. The payment of monetary penalties, unlike the ability to remain silent, is something that a corporation can do as an entity, and the Court has reviewed fines and monetary penalties imposed on corporations under the Fourteenth Amendment at a time when the Eighth Amendment did not apply to the States. See *Waters-Pierce Oil Co.* v. *Texas,* 212 U. S. 86, 111–112 (1909). See also *St. Louis I. M. & S. R. Co.* v. *Williams,* 251 U. S. 63, 66–67 (1919). If a corporation is protected by the Due Process Clause from overbearing and oppressive monetary sanctions, it is also protected from such penalties by the Excessive Fines Clause. See *Whitney Stores, Inc.* v. *Summerford,* 280 F. Supp. 406, 411 (SC) (three-judge court) (entertaining Eighth Amendment challenge by corporation to fine for violation of Sunday closing laws), summarily aff'd, 393 U. S. 9 (1968).

## II

Language in *Ingraham* v. *Wright,* 430 U. S. 651 (1977), and *Ex parte Watkins,* 7 Pet. 568 (1833), suggests that the *entire* Eighth Amendment is confined to criminal prosecutions and punishments. But as the Court correctly acknowl-

edges, *ante*, at 262–263, and n. 3, that language is not dispositive here.

In *Ingraham*, the Court held that the Cruel and Unusual Punishments Clause of the Eighth Amendment does not apply to disciplinary corporal punishment at a public school. Because the Excessive Fines Clause was not at issue in *Ingraham*, the Court's statement that the "text of the [Eighth] Amendment suggests an intention to limit the power of those entrusted with the criminal-law function of government," 430 U. S., at 664, is not controlling. The similar statement in *Ex parte Watkins*, that the Eighth Amendment "is addressed to courts of the United States exercising criminal jurisdiction," 7 Pet., at 573–574, is dictum, for the Court there held only that it did not have appellate jurisdiction to entertain a challenge, by way of a writ for habeas corpus, to criminal fines imposed upon a defendant: "[T]his Court has no appellate jurisdiction to revise the sentences of inferior courts in criminal cases; and cannot, even if the excess of the fine were apparent on the record, reverse the sentence." *Id.*, at 574. There is another reason not to rely on or be guided by the sweeping statements in *Ingraham* and *Ex parte Watkins*. Those statements are inconsistent with the Court's application of the Excessive Bail Clause of the Eighth Amendment to civil proceedings in *Carlson* v. *Landon*, 342 U. S. 524, 544–546 (1952) (immigration and deportation). See *United States* v. *Salerno*, 481 U. S. 739, 754 (1987) (recognizing that *Carlson* "was a civil case"). In sum, none of the Court's precedents foreclose application of the Excessive Fines Clause to punitive damages.

### III

The history of the Excessive Fines Clause has been thoroughly canvassed in several recent articles, all of which conclude that the Clause is applicable to punitive damages. See Boston, Punitive Damages and the Eighth Amendment: Application of the Excessive Fines Clause, 5 Cooley L. Rev.

667 (1988) (Boston); Massey, The Excessive Fines Clause and Punitive Damages: Some Lessons from History, 40 Vand. L. Rev. 1233 (1987) (Massey); Jeffries, A Comment on the Constitutionality of Punitive Damages, 72 Va. L. Rev. 139 (1986) (Jeffries); Note, The Constitutionality of Punitive Damages Under the Excessive Fines Clause of the Eighth Amendment, 85 Mich. L. Rev. 1699 (1987) (Note). In my view, a chronological account of the Clause and its antecedents demonstrates that the Clause derives from limitations in English law on monetary penalties exacted in civil *and* criminal cases to punish and deter misconduct. History aside, this Court's cases leave no doubt that punitive damages serve the same purposes—punishment and deterrence—as the criminal law, and that excessive punitive damages present precisely the evil of exorbitant monetary penalties that the Clause was designed to prevent.

### A

The story of the Excessive Fines Clause begins in the "early days of English justice, before crime and tort were clearly distinct." Jeffries 154. Under the Saxon legal system in pre-Norman England, the victim of a wrong would, rather than seek vengeance through retaliation or "blood-feud," accept financial compensation for the injury from the wrongdoer. The wrongdoer could also be made to pay an additional sum "on the ground that every evil deed inflicts a wrong on society in general." W. McKechnie, Magna Carta 284–285 (1958) (McKechnie).

At some point after the Norman Conquest in 1066, this method of settling disputes gave way to a system in which individuals who had engaged in conduct offensive to the Crown placed themselves "in the King's mercy" so as not to have to satisfy all the monetary claims against them. *Id.*, at 285. See generally 2 F. Pollock & F. Maitland, The History of English Law 512–516 (2d ed. 1899) (Pollock & Maitland). In order to receive clemency, these individuals were required to pay an "amercement" to the Crown, its representative, or

a feudal lord. *Tumey* v. *Ohio,* 273 U. S. 510, 525 (1927); Massey 1252–1253, and n. 111. But cf. R. Stringham, Magna Carta: Fountainhead of Freedom 40 (1966) (a share of the amercement went to the victim or the victim's family). Because the amercement originated at a time when there was little distinction between criminal law and tort law, it was "neither strictly a civil nor a criminal sanction." Note, at 1716. Blackstone, however, clearly thought that amercements were civil punishments. See 4 W. Blackstone, Commentaries *372 ("amercements for misbehaviour in matters of civil right"). As one commentator has noted, the "amercement was assessed most commonly as a civil sanction for wrongfully bringing or defending a civil lawsuit." Massey 1251. The list of conduct meriting amercement was voluminous: trespass, improper or false pleading, default, failure to appear, economic wrongs, torts, and crimes. See generally *Beecher's Case,* 8 Co. Rep. 58a, 59b–61b, 77 Eng. Rep. 559, 564–567 (Ex. 1609).

The amount of an amercement was set arbitrarily, according to the extent to which the King or his officers "chose to relax the forfeiture of all the offender's goods." Jeffries 154–155. See also Boston 725. Because of the frequency and sometimes abusive nature of amercements, Chapter 20 of Magna Carta, 9 Hen. III, ch. 14 (1225), prohibited amercements that were disproportionate to the offense or that would deprive the wrongdoer of his means of livelihood:

> "A Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement; and a Merchant likewise, saving to him his Merchandise; and any other's villain than ours shall be ` likewise amerced, saving his wainage, if he fall into our mercy. And none of the said amerciaments shall be assessed, but by the oath of honest and lawful men of the vicinage. Earls and Barons shall not be amerced but by their Peers, and after the manner of their offence. No man of

the Church shall be amerced after the quantity of his spiritual Benefice, but after his Lay-tenement, and after the quantity of his offence" (numbers omitted).

After Magna Carta, the amount of an amercement was initially set by the court. A group of the amerced party's peers would then be assembled to reduce the amercement in accordance with the party's ability to pay. McKechnie 288–289. For example, in *Le Gras* v. *Bailiff of Bishop of Winchester*, Y. B. Mich. 10 Edw. II, pl. 4 (C. P. 1316), reprinted in 52 Publications of the Selden Society 3, 5 (1934), an amercement for improper civil pleading was vacated, and the bailiff who had imposed the amercement was ordered to "take a moderate amercement proper to the magnitude and manner of that offence." See also Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 845–846 (1969) (Granucci) (listing other examples of amercements that were reduced or set aside).

Fines and amercements had very similar functions. Fines originated in the 13th century as voluntary sums paid to the Crown to avoid an indefinite prison sentence for a common-law crime or to avoid royal displeasure. 2 Pollock & Maitland 517; Massey 1261. The fine operated as a substitute for imprisonment. Having no actual power to impose a fine, the court would sentence the wrongdoer to prison. "To avoid imprisonment, the wrongdoer would then 'make fine' by 'voluntarily' contracting with the Crown to pay money, thereby ending the matter. The Crown gradually eliminated the voluntary nature of the fine by imposing indefinite sentences upon wrongdoers who effectively would be forced to pay the fine. Once the fine was no longer voluntary, it became the equivalent of an amercement." Note, at 1715. See also Boston 719–720. Although in theory fines were voluntary while amercements were not, the purpose of the two penalties was equivalent, and it is not surprising that in practice it became difficult to distinguish the two.

## B

By the 17th century, fines had lost their original character of bargain and had replaced amercements as the preferred penal sanction. The word "fine" took on its modern meaning, while the word "amercement" dropped out of ordinary usage. McKechnie 293. But the nomenclature still caused some confusion. See *Griesley's Case*, 8 Co. Rep. 38a, 77 Eng. Rep. 530 (C. P. 1609) ("fine" for refusing to serve as a constable analyzed as an "amercement"). William Shakespeare, an astute observer of English law and politics, did not distinguish between fines and amercements in the plays he wrote in the late 16th century. In Romeo and Juliet, published in 1597, Prince Escalus uses the words "amerce" and "fine" interchangeably in warning the Montagues and the Capulets not to shed any more blood on the streets of Verona:

> "I have an interest in your hate's proceeding,
> My blood for your rude brawls doth lie a-bleeding;
> But I'll amerce you with so strong a fine,
> That you shall all repent the loss of mine."
> Act III, scene 1, lines 186–189.

The preeminence of fines gave courts much more power, for only they could impose fines. Massey 1253. Once it was clear that Magna Carta did not apply to fines for offenses against the Crown, see *John Hampden's Case*, 9 State Tr. 1054, 1126 (K. B. 1684), English courts during the reigns of Charles II and James II took advantage of their newly acquired power and imposed ruinous fines on wrongdoers and critics of the Crown. After James II fled England during the Glorious Revolution of 1688–1689, the House of Commons, in an attempt to end the crisis precipitated by the vacation of the throne, appointed a committee to draft articles concerning essential laws and liberties that would be presented to William of Orange. As the Court correctly notes, some of the men who made up the committee had been subjected to heavy fines by the courts of James II. See gener-

ally L. Schwoerer, The Declaration of Rights, 1689, pp. 30–33, 91–92 (1981) (Schwoerer). The committee ultimately reported 13 Articles to the House of Commons. The final draft of Article 10 provided that "excessive Baile ought not to be required, nor excessive Fines imposed, nor cruel and unusual Punishments inflicted." 1 Wm. & Mary, 2d Sess., ch. 2, 3 Stat. at Large 440, 441 (1689).

According to Blackstone, the English Bill of Rights was "only declaratory . . . of the old constitutional law." 4 W. Blackstone, Commentaries *372. See also Schwoerer 92 (excessive fines provision of Article 10 "reaffirmed ancient law"). Of course, the only prohibition on excessive monetary penalties predating Article 10 was contained in Magna Carta. "Since it incorporated the earlier prohibition against excessive amercements — which could arise in civil settings — as well as other forms of punishment, [Article 10's limitation on excessive fines] cannot be limited to strictly criminal cases but extends to monetary sanctions imposed in both criminal and civil contexts." Note, at 1717. Because the word "amercement" had dropped out of ordinary usage by the late 17th century, it appears that the word "fine" in Article 10 was simply shorthand for all monetary penalties, "whether imposed by judge or jury, in both civil and criminal proceedings." Massey 1256. Indeed, three months *after* the adoption of the English Bill of Rights, the House of Lords reversed a fine by referring to Magna Carta, and not to Article 10. See *Earl of Devonshire's Case*, 11 State Tr. 1367, 1372 (H. L. 1689) (ruling that "fine" of £30,000 for striking another was "excessive and exorbitant, against Magna Charta, the common right of the subject, and the law of the land").

The Court argues that Chapter 20 of Magna Carta and Article 10 of the English Bill of Rights were concerned only with limiting governmental abuses of power. Because amercements and fines were paid to the Crown, the Court assumes that governmental abuses can only take place when the sovereign itself exacts a penalty. That assumption, however,

simply recalls the historical accident that, prior to the mid-18th century, monetary sanctions filled the coffers of the King and his barons.

As early as 1275, with the First Statute of Westminster, double and treble damages were allowed by statute. See *ante*, at 274. However, "[i]t was only after the prevalence of the amercement had diminished that the cases began to report the award of punitive damages as a common law entitlement." Massey 1266. One of the first reported cases allowing punitive damages is *Wilkes* v. *Wood*, Lofft. 1, 18–19, 98 Eng. Rep. 489, 498–499 (K. B. 1763): "[A] jury have it in their power to give damages for more than the injury received. Damages are designed not only as satisfaction to the injured person, but likewise as a punishment to the guilty, to deter from any such proceeding for the future, and as a proof of the detestation of the jury to the action itself." The link between the gradual disappearance of the amercement and the emergence of punitive damages provides strong historical support for applying the Excessive Fines Clause to awards of punitive damages. See Boston 728–732.

The case of *Lord Townsend* v. *Hughes*, 2 Mod. 150, 151, 86 Eng. Rep. 994, 994–995 (C. P. 1677), cited by the Court, *ante*, at 268, 272, is not inconsistent with this understanding of history. At the time *Hughes* was decided, damages were understood only as compensation for injury. See T. Blount, Law-Dictionary (1670) (Blount) (unpaginated) (defining "damages" as "a recompense for what the Plaintiff or Demandant *hath suffered*, by means of the wrong done him by the Defendant or Tenant") (emphasis added). *Hughes* involved an action for slander, and the jury was told to award damages for the harm the plaintiff had sustained. The damages awarded were entirely compensatory and did not contain any punitive element whatsoever. Thus, *Hughes* does not stand for the proposition that Magna Carta is inapplicable to punitive damages awarded in civil cases. For the same reasons, neither do the commentaries cited by the Court differentiating between

damages and amercements. See *ante*, at 265, n. 7, 270, n. 13. The damages referred to in those commentaries are compensatory, and not punitive, in nature. See, *e. g.*, Introduction to the Curia Regis Rolls, 1199–1230 A. D., in 62 Publications of the Selden Society 463 (C. Flower ed. 1944) (damages "represented the *loss* incurred by a litigant through an unlawful act") (emphasis added). Amercements and fines were not meant to compensate the injured plaintiff, but rather to punish the wrongdoer and express society's displeasure at the improper act. Compensatory damages, even in Saxon England, had not been limited by Magna Carta, which was meant to ensure that monetary *penalties*, assessed in addition to compensatory sums, have some measure of proportionality.

The Court also points out that in *Rookes* v. *Barnard*, [1964] A. C. 1129, 1221–1231, Lord Devlin, in his extensive discussion of exemplary damages and decision to limit them to certain cases, did not mention either Magna Carta or the Excessive Fines Clause of the English Bill of Rights. *Ante*, at 273, n. 18. Although this is a small point, I think the Court is mistaken to place any reliance on the lack of citation to Magna Carta or the English Bill of Rights in *Rookes*. English courts today need not cite those two documents, for the principles set forth in them are now ingrained as part of the common law. See J. Holt, Magna Carta 2 (1965) ("[I]t is now possible and indeed justifiable for a lawyer to compose a general survey of the freedom of the individual in England without once referring to Magna Carta"). Indeed, English courts have not cited Magna Carta or the English Bill of Rights in cases involving the excessiveness of *criminal* fines. See *Queen* v. *Asif*, 82 Cr. App. R. 123 (1985) (upholding fine of £25,000 for fraudulent evasion of taxes); *Queen* v. *Farenden*, 6 Cr. App. R. (S) 42 (1984) (finding that fine of £250 for first offense of careless driving was "too heavy" and reducing it to £100). Moreover, Lord Devlin noted in *Rookes* that punitive damages could be "used against liberty. Some of the awards that juries have made in the past seem to me to

amount to a greater punishment than would be likely to be incurred if the conduct were criminal . . . . I should not allow the respect which is traditionally paid to an assessment of damages by a jury to prevent me from seeing that the weapon is used without restraint." [1964] A. C., at 1227. Thus, he suggested that some limits might have to be placed on punitive damages: "It may even be that the House [of Lords] may find it necessary to . . . place some arbitrary limit on awards of damages that are made by way of punishment. Exhortations to be moderate may not be enough." *Id.*, at 1227–1228.

## C

There was little debate over the Eighth Amendment in the First Congress, and no discussion of the Excessive Fines Clause. Consideration of the Eighth Amendment immediately followed consideration of the Fifth Amendment. After deciding to confine the benefits of the Self-Incrimination Clause of the Fifth Amendment to criminal proceedings, the Framers turned their attention to the Eighth Amendment. There were no proposals to limit that Amendment to criminal proceedings, and the only discussion was by Mr. Smith of South Carolina and Mr. Livermore of New Hampshire, both of whom thought that the Cruel and Unusual Punishments Clause was too indefinite. See Granucci 842; *Weems* v. *United States*, 217 U. S. 349, 368–369 (1910). Exactly what significance the silence of the Framers has in constitutional interpretation is open to debate, compare, *e. g.*, L. Tribe, Constitutional Choices 42–44 (1985), with, *e. g.*, Powell, Rules for Originalists, 73 Va. L. Rev. 659, 671–672 (1987), but it is not necessary to address that issue here. The Eighth Amendment was based directly on Article I, § 9, of the Virginia Declaration of Rights of 1776, which had in turn adopted verbatim the language of § 10 of the English Bill of Rights. "There can be no doubt that the Declaration of Rights guaranteed at least the liberties and privileges of En-

glishmen." *Solem* v. *Helm,* 463 U. S. 277, 285–286, n. 10
(1983). See also A. Howard, The Road from Runnymede:
Magna Carta and Constitutionalism in America 205–207
(1968) (Howard). If anything is apparent from the history
set forth above, it is that a monetary penalty in England
could be excessive, and that there is a strong link between
amercements, which were assessed in civil cases, and fines.
Cf. *Solem, supra,* at 284, n. 8 (an "amercement was similar
to a modern-day fine"). There is, in short, considerable his-
torical support for application of the Excessive Fines Clause
to punitive damages.

The Court, however, thinks otherwise, and emphasizes
that at the time the Eighth Amendment was enacted, "the
word 'fine' was understood to mean a payment to a sovereign
as punishment for some offense." *Ante,* at 265, and n. 6.
In my view, the meaning of that word was much more ambig-
uous than the Court is willing to concede. In defining the
word "fine," some 18th-century dictionaries did not mention
to whom the money was paid. See, *e. g.,* T. Sheridan, A
Dictionary of the English Language (6th ed. 1796) (unpag-
inated) ("a mulct [or] a pecuniary punishment"); S. Johnson,
A Dictionary of the English Language (7th ed. 1785) (unpag-
inated) ("a mulct [or] pecuniary punishment," a "penalty," or
"money paid for any exemption or liberty"). To the same
effect are some 19th-century dictionaries. See, *e. g.,* 1 C.
Richardson, A New Dictionary of the English Language 796
(1839) ("any thing (as a sum of money) paid at the end, to
make an end, termination or conclusion of a suit, of a prosecu-
tion"). That the word "fine" had a broader meaning in the
18th century is also illustrated by the language of § 37 of the
Massachusetts Body of Liberties of 1641. That provision
granted courts the authority to impose on a *civil* plaintiff who
had instituted an improper suit "a proportionable *fine* to the
use of the defendant, or accused person." 1 B. Schwartz,
The Bill of Rights: A Documentary History 76 (1971) (empha-
sis added). It is noteworthy that the "fine" was payable to a

private party, and not a governmental entity.  Boston 714.
In 1646, the Massachusetts General Court ruled that § 37 of
the Body of Liberties was based directly on Chapter 20 of
Magna Carta.  Howard 401, 404.

The Court also finds it significant that, in the 18th and 19th
centuries, "fines were assessed in criminal, rather than in
private civil, actions." *Ante*, at 265, and n. 7.  Again, in my
view the Court's recitation of history is not complete.  As
noted above, § 37 of the Massachusetts Body of Liberties re-
quired that "fines" payable to private litigants in civil cases
be proportional.  Furthermore, not all 17th-century sources
unequivocally linked fines with criminal proceedings.  See
Blount ("fine" is *"sometimes* an amends, pecuniary punish-
ment, or recompence upon an offence committed against
the King, and his laws, or a Lord of a Mannor") (emphasis
added).  Nor did all American courts in the 19th century
view "fines" as exclusively criminal.  The Massachusetts
Supreme Judicial Court held that the word "fine" in a statute
meant "forfeitures and penalties recoverable in civil actions,
as well as pecuniary punishments inflicted by sentence."
*Hanscomb* v. *Russell*, 77 Mass. 373, 375 (1858).  It ex-
plained that "the word 'fine' has other meanings" besides
pecuniary penalties "inflicted by sentence of a court in the
exercise of criminal jurisdiction . . . as appears by most of
the dictionaries of our language, where it is defined not only
as a pecuniary punishment, but also as a forfeiture, a penalty,
[etc.]" *Id.*, at 374–375.  The Iowa Supreme Court had the
following to say about fines: "The terms, fine, forfeiture, and
penalty, are often used loosely, and even confusedly . . . .
A fine is a pecuniary penalty, and is commonly (perhaps al-
ways) to be collected by suit in *some* form.  A 'forfeiture' is
a penalty by which one loses his rights and interest in his
property." *Gosselink* v. *Campbell*, 4 Iowa 296, 300 (1856)
(emphasis added).  Hence, around the time of the framing
and enactment of the Eighth Amendment some courts and

commentators believed that the word "fine" encompassed civil penalties.

## D

In my view, the $6 million award of punitive damages imposed on BFI constitutes a fine subject to the limitations of the Eighth Amendment. In current usage, the word "fine" comprehends a forfeiture or penalty recoverable in a civil action. See Black's Law Dictionary 569 (5th ed. 1979); Webster's Third New International Dictionary 852 (1971). Not only is that understanding supported by the history set forth above, it is buttressed by this Court's precedents. Punitive damages are *"private fines levied by civil juries." Electrical Workers* v. *Foust*, 442 U. S. 42, 48 (1979) (emphasis added). They are not awarded to compensate for injury, but rather to further the aims of the criminal law: "'to punish reprehensible conduct and to deter its future occurrence.'" *Bankers Life & Casualty Co.*, 486 U. S., at 87 (O'CONNOR, J., concurring in part and concurring in judgment). See also Restatement (Second) of Torts § 908(1) (1979). Their role therefore "runs counter to the normal reparative function of tort and contract remedies." K. Redden, Punitive Damages § 2.1, p. 24 (1980). The Court's cases abound with the recognition of the penal nature of punitive damages. See *Tull* v. *United States*, 481 U. S. 412, 422, and n. 7 (1987); *Memphis Community School District* v. *Stachura*, 477 U. S. 299, 306, n. 9 (1986); *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 260–261 (1984) (BLACKMUN, J., dissenting); *Smith* v. *Wade*, 461 U. S. 30, 59 (1983) (REHNQUIST, J., dissenting); *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 266–267 (1981); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 350 (1974); *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29, 82 (1971) (MARSHALL, J., dissenting); *Lake Shore & M. S. R. Co.* v. *Prentice*, 147 U. S. 101, 107 (1893).

This plethora of case law on the nature of punitive damages, it seems to me, is sufficient to find the Excessive Fines Clause applicable to the award in this case. There is, how-

ever, even more support for the applicability of the Clause. In determining whether a sanction is penal, the Court has generally looked to several factors: (1) whether it involves an affirmative disability; (2) whether it has historically been regarded as punishment; (3) whether it comes into play on a finding of scienter; (4) whether its operation will promote retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether there is an alternative purpose for it; and (7) whether it is excessive in relation to the alternative purpose assigned. *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 168–169 (1963). I agree with those commentators who have found it easy to conclude that punitive damages are penal under the *Mendoza-Martinez* factors. See, *e. g.*, Grass, The Penal Dimensions of Punitive Damages, 12 Hastings L. Q. 241 (1985).

The character of a sanction imposed as punishment "is not changed by the mode in which it is inflicted, whether by a civil action or a criminal prosecution." *United States* v. *Chouteau*, 102 U. S. 603, 611 (1881). As the Court wrote only recently, "a civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can be explained only as also serving either retributive or deterrent purposes, is punishment." *United States* v. *Halper*, 490 U. S. 435, 448 (1989) (emphasis added). In order to evade the teachings of cases like *Choteau* and *Halper*, the Court determines that the Excessive Fines Clause becomes relevant only when some governmental entity is seeking to reap the benefits of a monetary sanction. *Ante*, at 275–276. I disagree with the Court's formalistic analysis. A governmental entity can abuse its power by allowing civil juries to impose ruinous punitive damages as a way of furthering the purposes of its criminal law. Cf. *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 937 (1982). I also note that by relying so heavily on the distinction between governmental involvement and purely private suits, the Court suggests (despite its claim, *ante*, at 275–276, n. 21, that it leaves the question open) that

the Excessive Fines Clause will place some limits on awards of punitive damages that are recovered by a governmental entity. See, *e. g.*, Fla. Stat. § 768.73(2)(b) (1987) (60% of any award of punitive damages is payable to the State).

As far as I know, the applicability of a provision of the Constitution has never depended on the vagaries of state or federal law, and in *Missouri Pacific R. Co.* v. *Humes*, 115 U. S. 512 (1885), the Court stressed the constitutional insignificance of how a monetary sanction is administered or by whom it is recovered. *Humes* involved a state statute providing for double damages to any individual who suffered harm due to a railroad's failure to maintain fences and cattle guards. In holding that the double damages provision did not violate the Fourteenth Amendment, *id.*, at 522–523, the Court said:

> "The additional damages being by way of punishment, . . . it is not a valid objection that the sufferer instead of the State receives them. . . . The power of the State to impose fines and penalties for a violation of its statutory requirements is coeval with government; and the mode in which they shall be enforced, whether at the suit of a private party, or at the suit of the public, and what disposition shall be made of the amounts collected, are merely matters of legislative discretion."

*Humes* teaches that the identity of the recipient of a monetary penalty is irrelevant for purposes of determining the constitutional validity of the penalty. From the standpoint of the defendant who has been forced to pay an excessive monetary sanction, it hardly matters what disposition is made of the award.

## IV

The only remaining question is whether the award of over $6 million in this case is "excessive" within the meaning of the Eighth Amendment.

## A

Using economic analysis, some of the *amici* in support of BFI argue that the wealth of a defendant should not, as a constitutional matter, be taken into account in setting the amount of an award of punitive damages. See, *e. g.*, Brief for Navistar International Transportation Corp. as *Amicus Curiae* 9–25. It seems to me that this argument fails because the Excessive Fines Clause is only a substantive ceiling on the *amount* of a monetary sanction, and not an economic primer on what factors best further the goals of punishment and deterrence. Just as the Fourteenth Amendment does not enact Herbert Spencer's Social Statics, see *Lochner* v. *New York*, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting), the Eighth Amendment does not incorporate the views of the Law and Economics School. The "Constitution does not require the States to subscribe to any particular economic theory." *CTS Corp.* v. *Dynamics Corp. of America*, 481 U. S. 69, 92 (1987). Moreover, as a historical matter, the argument is weak indeed. First, Magna Carta only required that an amercement be proportionate and not destroy a person's livelihood. Second, Blackstone remarked that the "*quantum*, in particular, of pecuniary fines neither can, nor ought to be, ascertained by any invariable law. The value of money itself changes from a thousand causes; and at all events, what is ruin to one man's fortune, may be a matter of indifference to another's." 4 W. Blackstone, Commentaries *371.

## B

Determining whether a particular award of punitive damages is excessive is not an easy task. The proportionality framework that the Court has adopted under the Cruel and Unusual Punishments Clause, however, offers some broad guidelines. See *Solem*, 463 U. S., at 290–292. Cf. *United States* v. *Busher*, 817 F. 2d 1409, 1415 (CA9 1987) (applying *Solem* factors to civil forfeiture under RICO). I would adapt the *Solem* framework to punitive damages in the following

manner.   First, the reviewing court must accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.   Second, the court should examine the gravity of the defendant's conduct and the harshness of the award of punitive damages.   Third, because punitive damages are penal in nature, the court should compare the civil *and* criminal penalties imposed in the same jurisdiction for different types of conduct, and the civil *and* criminal penalties imposed by different jurisdictions for the same or similar conduct.   In identifying the relevant civil penalties, the court should consider not only the amount of awards of punitive damages but also statutory civil sanctions. In identifying the relevant criminal penalties, the court should consider not only the possible monetary sanctions, but also any possible prison term.

The Court of Appeals did not think that the Excessive Fines Clause applied to awards of punitive damages, 845 F. 2d, at 410, and therefore did not conduct any sort of proportionality analysis.   I would remand the case to the Court of Appeals so that it could, in the first instance, apply the *Solem* framework set forth above and determine whether the award of over $6 million imposed on BFI violates the Excessive Fines Clause.