IRVIN INDUSTRIES, INC., Plaintiff,

v.

GOODYEAR AEROSPACE
CORPORATION,
Defendant.

No. 86 Civ. 8402 (WK).

United States District Court,
S.D. New York.

Oct. 1, 1991.

Lanny Davis, Charles E. Talisman, Patton, Boggs & Blow, Washington, D.C., Walter A. Begos, Schiavetti, Begos & Nicholson, New York City, for plaintiff.

William D. Iverson, Elliott Schulder, Covington & Burling, Washington, D.C., John M. Townsend, Hughes Hubbard & Reed, New York City, for defendant.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

This action arises out of a claim that the defendant violated provisions of the antitrust laws, namely section 2 of the Sherman Act, 15 U.S.C. § 2, sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15 and § 26, and the common law of the state of New York [1]. The gravamen of the complaint is that defendant exerted monopoly power over the U.S. market for a product known as the BSU–49, and that it engaged in anticompetitive conduct, including predatory pricing, to maintain this power. Plaintiff alleges that it suffered monetary injury as a result of this anticompetitive conduct, and prays for an award of damages in excess of $100 million dollars. Pursuant to Fed.R.Civ.P. 56, defendant moves for the entry of summary judgment on all claims. For the reasons that follow, this motion is granted.

## BACKGROUND

After four years, discovery has produced in excess of nine hundred thousand pages of deposition testimony and documentary evidence [2]. A comparison of the parties' papers reveals that almost every conceivable fact is disputed. For purposes of this motion, we resolve every disputed fact in plaintiff's favor. For example, we accept as gospel the testimony of its expert, Leslie Leiper ("Leiper"). With this as background, we turn to a statement of the relevant facts.

\* \* \*

The BSU–49 is a product used by the United States Air Force (hereinafter "Air Force") to decelerate the descent of bombs from low-flying aircraft to give the aircraft time to move safely out of the bombs' fragmentation range. The BSU–49 consists of two component parts: a ballute, which is a combination balloon-parachute and acts as the aerodynamic decelerator, and a tailcone, which is a metal cylinder which holds the ballute and attaches it to the bomb.

In 1977 the Air Force awarded defendant a research and development contract to design and produce this product. It proceeded to develop the necessary specifications for this device, and in 1982 the Government, in particular the Army [3], awarded it the first major procurement contract for production of the BSU–49. The Army chose to award defendant this contract on a sole-source basis, and paid it a per-unit price of $667.04. In 1983 and 1984 the Army again awarded defendant a sole-source contract for production of the BSU–49, paying it $558/unit for 80,000 units in 1983 and $581/unit for 86,004 in 1984.

During these years plaintiff was one of three subcontractors employed by defendant to manufacture the ballute component of the BSU–49 [4]. In 1982 plaintiff received from defendant a subcontract for 7,188 ballutes at a unit price of $187; and in 1983 it received a larger subcontract to supply 10,764 ballutes at a price of $189.31. In early 1984 defendant instructed plaintiff to reduce its output to a 7,800 ballute level. When plaintiff requested that it be given a larger share of the ballute subcontract business and offered to lower its price for the ballute if defendant increased the quan-

---

1. Jurisdiction is also properly invoked pursuant to 28 U.S.C. § 1332. Plaintiff is a New York corporation with its principal place of business in New York City. Defendant is a Delaware corporation with its principal place of business in Akron, Ohio. Compl. ¶¶ 5, 7, 8.

2. *See e.g.* Plaintiff's Exh. on Opposition.

3. Sometime in the early 1980's procurement responsibility for the BSU–49 was assigned to the

Army Armament Munitions and Chemical Command. For ease of reference, we refer to this governmental unit as "the Army" for the remainder of our discussion.

4. The other two ballute subcontractors were Raven Industries, Inc. and Carolina Parachute Corporation.

tity purchased, defendant refused so to accommodate plaintiff.

Accordingly, in 1984 plaintiff decided that it would seek to enter the BSU–49 market as a direct competitor of defendant's. In July it approached the Army to request a copy of the BSU–49 "technical data package" (hereinafter "TDP") which set forth the necessary specifications and drawings for all components of this product. Although defendant was under contract with the Army to keep it supplied with a current TDP, the Army informed plaintiff that it could not then lay its hand on the most recent one. Over the course of the next six months plaintiff made repeated requests to the Army for this package, and in February 1985 the Army eventually asked defendant whether or not it had or was willing to give the Army a complete TDP. When defendant was so requested to produce an updated copy, it immediately complied. Although the record suggests that defendant was aware plaintiff was looking for this information, there is no suggestion that anyone—either plaintiff or the Army—made any request of defendant before the one just mentioned.

In the interim, in October 1984 defendant had sent a memorandum to the Army entitled "Time Required to Develop a BSU–49 Second Source". This memorandum set forth defendant's opinion that it would take approximately 4½ to 5 years for another company to qualify as a producer of the BSU–49 [5]. The memorandum also advised that defendant did not think it wise to develop a second source, asserting, *inter alia*, that "there is a risk that a new contractor will not be successful and no qualified product ever will be produced". Defendant also informed the Army that it was presently developing a new concept for the ballute component of the BSU–49, namely the "braided retarder concept" which it anticipated would offer significant cost reductions over the long term.

In November, after receipt of the October memorandum, the Army informed plaintiff that it had exercised its option under the 1984 BSU–49 contract to purchase from defendant its 1985 supply of BSU–49s on a sole-source basis at a unit price of $608 for 86,004. In response, plaintiff submitted an unsolicited proposal to produce 36,000 BSU–49s for $520/unit. In early January 1985 the Army summarily rejected this proposal. Plaintiff thereupon filed a suit against the Government seeking the right to compete for the BSU–49 contracts [6]. It also commenced a lobbying effort to persuade Congress to support competitive procurements in this area [7]. While this suit was pending, defendant took occasion to convey to the Army its belief that plaintiff was "greedy", and that plaintiff had been two months late in the delivery of a product to it in the past [8]. Nonetheless, in May, in accord with the terms of a

---

5. To qualify as a contractor for the BSU–49 a company must be designated as a "mobilization base" producer by the Government, *see* 10 U.S.C. § 2304(a)(16) (1984), and pass stringent site survey requirements and environmental and flight tests. *See* Compl. ¶¶ 14–16.

6. *Irvin Industries v. United States of America, et al.* (Civ. Action No. 85–0206) (filed January 18, 1985). The complaint in this action alleged, *inter alia,* that the Government unlawfully exercised the option in GAC's 1984 contract by failing to evaluate alternative competitive sources in the procurement of the BSU–49, in violation of 10 U.S.C. § 2304(g) (1984). *See* Compl. ¶ 53.

7. In 1984 Congress passed the Competition in Contracting Act of 1984, 10 U.S.C. § 2301 *et seq.,* which superseded provisions of the Armed Services Procurement Act of 1947, formerly codified at 10 U.S.C. § 2304(a)(16) (1984). The new

law requires that government contract procurements be submitted to "full and open competition"—whether by sealed bidding or other competitive procedures—except under six enumerated circumstances. The new law, however, does not cover the BSU–49 contracts, as mobilization base programs are included in one of the enumerated exceptions. *See* 10 U.S.C. § 2304(c)(3) (1990).

8. Evidence of these allegedly defamatory statements comes from the deposition testimony of a government contracting officer, Mr. Bronson, taken by plaintiff in its suit *Irvin Industries v. United States of America, et al.* (Civ. Action No. 85–0206), *see supra* n. 6. Plaintiff advises us that Mr. Bronson died before he could be deposed in this action. As defendant was not a party to that litigation, it is doubtful whether this deposition testimony would here be admis-

settlement agreement between plaintiff and the Government, the Army agreed to hold a competitive procurement to select a second supplier for the 1985 BSU–49 contract.

Upon receipt of this information, defendant informed its subcontractors, including plaintiff, that it would consider discontinuing doing business with any entity which elected to compete against it as a prime contractor, explaining that it might not want to be dependent on a competitor. Despite this announcement, in August plaintiff and another of defendant's subcontractors, Lanson Industries (hereinafter "Lanson"), along with six other companies, submitted bids for the interim procurement contract. Defendant was precluded by the Government from bidding on this contract, and plaintiff won it with a bid of $398/unit.

After plaintiff won the interim procurement contract, defendant informed it that in order to be permitted to quote on a subcontract with defendant for production of the ballute component plaintiff would have to be willing to make a commitment to provide ballutes for both 1985 and 1986. Plaintiff asserts that since "it hoped to be ready to compete head-on" with defendant for the 1986 BSU–49 contract, it declined to quote under these restrictions. Accordingly, defendant did not employ plaintiff as a ballute subcontractor in 1985.

In October defendant informed the Army that unless it was advised by April 1, 1986 that it would be awarded part of the 1986 BSU–49 contract it would suffer a production break that would result in "costly start-up costs". It also conveyed its belief that plaintiff would not be able to demon-

strate its ability to produce the BSU–49 in time to permit a competitive procurement for the 1986 contract. When the Army inquired of defendant about decelerating its 1985 production rate to avoid any breaks in production, it responded that reducing its monthly production would also increase its costs, but that it "might consider some ... reductions ... if [it] is provided the [1986] contract sole source."

Thereafter, in March 1986 the Army advised defendant that it intended to award it a sole source contract for production of the BSU–49 in 1986, and requested pricing information. On March 18 defendant responded by quoting a price "not to exceed" $575/unit. When this information was publicly disclosed in May plaintiff filed a protest with the Comptroller General seeking to halt the award. Compl. ¶ 75. Thereafter, the Army withdrew its offer to defendant and announced that it would solicit competitive bids for the entire BSU–49 1986 contract.

In May defendant met with its subcontractors, Lanson and Raven, and informed them that it intended to bid "min. to zero profit" on the 1986 contract, and asked their assistance in helping it to submit a highly competitive bid. Pursuant to this conversation, Lanson quoted defendant a price of $102.77/unit for production of the tailcone component in 1986, $63.90 less than its April quote for this subcontract. Lanson quoted plaintiff a price of $144/ unit for a similar subcontract[9]. At or about this time, defendant anticipated that plaintiff would submit a bid of $346/unit for the contract.

In August the Army requested bid proposals for 62,628 BSU–49s to meet its fiscal year 1986 requirements.[10] In response defendant bid $332/unit and plaintiff bid

sible. However, for present purposes we assume it to be true.

9. Although Lanson's quote to plaintiff was for a lower number of units, namely 18,000 tailcones as compared with its proposed contract with defendant for 62,628 tailcones, for purposes of this motion we assume the contracts were identical.

10. The Army's solicitation informed that it sought a contract to supply 62,628 ballutes in 1987, with an option to supply 125,256 units in 1988 and 1989. Regardless of the amount of the 1988–89 option bid, according to the terms of the solicitation the Army was required to accept the lowest single year bid. Compl. ¶ 79.

$376/unit. Accordingly, the contract valued at more than $20 million dollars was awarded to defendant.

According to the testimony of Leiper, plaintiff's expert certified public accountant who examined the books of defendant for purposes of this litigation, defendant's $332 bid did not adequately reflect its costs of production, but was below its average variable costs and therefore predatory[11]. Leiper's testimony is that defendant's average variable costs for this contract should have fallen in the range of $367.13 to $378.82.

In November 1986 plaintiff filed the instant complaint.[12] Since then it has won every competitive contract the Army has awarded for the BSU–49. In particular, in the spring of 1987 it won the 1987 contract by bidding $311/unit, beating defendant's bid of $329/unit, and it won the 1988 and 1989 contracts with bids of $326.50 and $269, respectively.

## DISCUSSION

### Monopolization claims

■ To prevail on a claim of monopolization under Section 2 of the Sherman Act a private plaintiff must demonstrate: (1) that the defendant had monopoly power in a relevant market; (2) that it engaged in anticompetitive conduct to acquire or maintain that power; and (3) that the plaintiff suffered injury as a result of the defendant's anticompetitive exercise of its monopoly power. *See United States v. Grinnell* (1966) 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778; *U.S.F.L. v. N.F.L.* (2d Cir.1988) 842 F.2d 1335, 1359, 1377; *Argus Inc. v. Eastman Kodak Co.*

(2d Cir.1986) 801 F.2d 38, 41 ("lack of causation in fact is fatal to the merits of any antitrust claim").

Although it might well be argued that a monopoly deliberately established by the Government should not be treated as "monopoly power" within the meaning of the antitrust laws, we reject any such argument for the purposes of this motion. We therefore assume that defendant enjoyed monopoly power from 1982 through 1985. Accordingly we turn to the question of the adequacy of plaintiff's allegations that starting as early as 1984 defendant engaged in a continuous course of anticompetitive conduct designed to prohibit competition in the BSU–49 market and maintain its monopolist position, and that such unlawful conduct caused plaintiff injury. Plaintiff's claims of predatory conduct can be divided into six basic groups, and we address each in turn.

### (1) Predatory Pricing

■ The primary allegation of anticompetitive conduct set forth in the complaint—and the one to which the parties devoted the major portion of their briefs—is that defendant in 1986 deliberately reduced its bid price for the BSU–49 to an absurdly low, predatory, figure to preclude plaintiff from gaining a foothold in the BSU–49 market.

Accepting Leiper's testimony that defendant's average variable costs for the 1986 contract should have fallen in the range of $367.13 to $378.82, we are compelled to conclude that defendant's bid of $332 was predatory and a *per se* violation of the antitrust laws. *See Cargill, Inc. v. Monfort of Colorado, Inc.* (1986) 479 U.S. 104,

---

**11.** Although not material to our discussion, a brief explanation of the relevant pricing terminology may be helpful here. "Variable costs" are those which fluctuate with a firm's output, and typically include such costs as materials, fuel, and labor. In contrast, "fixed costs" are those which are independent of output, e.g. management expenses, irreducible overhead. An estimate of "total costs" represents the sum of both fixed and variable costs. The sum of all variable costs divided by output yields average variable costs. Prices below average variable costs are presumed to be predatory and in violation of the antitrust laws. *See Northeastern Tel. Co. v. A.T. & T.* (2d Cir.1981) 651 F.2d 76, 86.

**12.** In July 1987 plaintiff filed a separate action against this defendant, alleging, *inter alia*, that the information which defendant submitted to the Army concerning its costs for the BSU–49 in the years 1982 through 1985 was false. *United States of America, ex rel. Irvin Industries, Inc. v. Goodyear Aerospace Corp.* 87 Civ. 4444. This False Claims Act suit is still pending.

121, 107 S.Ct. 484, 495, 93 L.Ed.2d 427; *Northeastern Tel. Co. v. A.T. & T.* (2d Cir.1981) 651 F.2d 76, 86. Accordingly, as it is axiomatic that "an antitrust plaintiff must demonstrate that the injury it claims to have suffered was, in fact, caused by the defendant's violation of the antitrust laws", *U.S.F.L. v. N.F.L., supra* at 1377, we turn to the pivotal question presented by this motion: on the basis of the facts presented, could a reasonable jury conclude that it is more probable than not that the injury plaintiff claims to have suffered, namely the "loss of business" associated with the 1986 contract,[13] was caused by this violation?

We find that plaintiff is unable to demonstrate this requisite causation. Plaintiff's own expert's testimony—which we have accepted as true—is that any bid for the 1986 contract at or above $367.16 would have been lawful. That is to say—according to plaintiff's expert—that which made defendant's conduct unlawful was that its bid was below its average variable costs of $367.16. It necessarily follows that the failure of plaintiff's $376 bid was in no way caused by the *unlawful nature* of defendant's conduct. In other words, plaintiff can not demonstrate that it would have won the contract but for defendant's allegedly predatory conduct[14]. *See Northwest Publications, Inc. v. Crumb* (9th Cir.1985) 752 F.2d 473; *Zimmerman v. National Football League* (D.D.C.1986) 632 F.Supp. 398 (where evidence shows that plaintiff would have found itself in the same position if the defendant had not acted in an allegedly anticompetitive manner, "as a matter of law, [plaintiff] cannot show that he was injured 'by reason of' the [alleged anticompetitive conduct of defendant]"); *cf. Hudson Val. Asbestos Corp. v. Tougher H. & P. Co., Inc.* (2d Cir.1975) 510 F.2d 1140, *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975) (antitrust plaintiff's

"failure to prove that it was injured 'by reason of' the defendants' alleged antitrust violations is of course sufficient to defeat [its] claims"). We therefore find that as a matter of law plaintiff can not prevail on this claim.

Plaintiff's principle reliance on *Lee Moore Oil. Co. v. Union Oil Co.* (4th Cir. 1979) 599 F.2d 1299 is misplaced. There it was alleged that defendant Union Oil Company had canceled plaintiff's franchise in furtherance of a conspiracy to drive plaintiff and other independent operators out of the business of supplying service stations with petroleum products. The Fourth Circuit found it irrelevant whether or not such alleged cancellation might have been lawful had it not occurred in furtherance of the alleged conspiracy. This was a routine application of the doctrine that an overt act performed in the course of an unlawful conspiracy need not of itself be unlawful. See *e.g. United States v. Slocum* (2d Cir. 1982) 695 F.2d 650, 654 *cert. denied* 460 U.S. 1015, 103 S.Ct. 1260, 75 L.Ed.2d 487.

Turning then to the remainder of plaintiff's allegations of anticompetitive conduct, we observe at the outset that the trouble with each of them is that plaintiff has failed to produce any evidence either establishing the "anticompetitive" quality of the alleged conduct or demonstrating that such conduct caused it injury.

### (2) Reduction of 1984 Subcontract

■ Plaintiff contends that defendant's conduct in reducing its subcontract allocation to plaintiff in 1984 was anticompetitive. *See* Compl. ¶ 32–33. We first observe that since defendant did not refuse to do business with plaintiff in 1984, but merely instructed it to reduce its subcontract production to the previous year's level, we find it doubtful that such conduct could be construed as unlawful. *See Lee Moore, supra* at 1302 ("It is, of course, an

---

13. *See* Pl.Mem. at 52, 124.

14. Both parties in their briefs speculate as to whether plaintiff's bid was premised on "greed" or only a desire to make a reasonable profit. Such speculation is wholly immaterial. If, on the one hand, plaintiff's bid was greedily arrived

at or, on the other hand, was the lowest possible bid it could have made without itself becoming predatory, the fact remains that the predatory quality of defendant's bid had absolutely no causal relation to the rejection of plaintiff's.

established principle that a supplier may lawfully refuse to deal with a customer, so long as the refusal does not involve an illegal combination or agreement"). *But see Berkey Photo, Inc. v. Eastman Kodak Co.* (2d Cir.1979) 603 F.2d 263, 275 (recognizing that conduct which might be considered harmless when performed by a smaller market participant, may be illegal when taken by a monopolist because it tends to destroy competition). However, assuming *arguendo* that a reasonable jury could find that defendant's actions in this regard were anticompetitive, the allegations of the complaint make clear that this conduct's effect was to motivate plaintiff to enter the BSU–49 market as a direct competitor of defendant's. Accordingly, whatever else might be thought about it, such conduct can hardly be said to have had a tendency to "destroy competition".

### (3) Anticompetitive Agreements

■ The complaint contains several allegations concerning defendant's entering into agreements with Lanson and other suppliers to prevent them from supplying their services to plaintiff. *See* Compl. ¶¶ 37–38. In particular, plaintiff alleges that defendant "pressured Lanson not to deal with [plaintiff] on an equal basis" and "succeeded in causing Lanson to regard [plaintiff] as a 'competitor' to the Goodyear–Lanson team". After four years of discovery, however, plaintiff has produced no evidence to support a finding that any such unlawful agreements existed [15]. Although it is an undisputed fact that Lanson submitted a higher price to plaintiff than it did to defendant for tailcones for the 1986 contract, there is no scintilla of evidence that anything said or done by the defendant played any part in Lanson's pricing decisions in this regard. As to plaintiff's specific claim that defendant "succeeded in causing Lanson to regard [plaintiff] as a 'competitor' to the Goodyear–Lanson team", we note only that it is beyond dispute that plaintiff *was* a competitor to the

Goodyear–Lanson team, a fact which was patently obvious to all concerned. Relatedly, assuming that defendant's mere statement to its subcontractors, including Lanson, that it would have to reconsider whether or not to continue doing business with them in the event they chose to enter the BSU–49 business as direct competitors is evidence of illegal conduct, the undisputed facts reveal that this statement did not "chill" either plaintiff's or Lanson's behavior. Both proceeded to submit bids for the interim procurement contract, and there is no proof that defendant ever refused to deal with either of them. Accordingly, we can not see what injury plaintiff could claim to have suffered.

### (4) Wrongful Withholding of TDP

Plaintiff asserts that defendant wrongfully "[withheld] from the Government and [plaintiff] for an excessive time the technical data package necessary to build the BSU–49", thereby increasing plaintiff's engineering costs and making its entry into this market more difficult. *See* Compl. ¶¶ 41–46. As to this, the only entity to which defendant was obligated to supply a TDP was the Army, to which defendant did supply it as soon as requested.

### (5) Defamatory and Disparaging Statements

■ A repeated theme in the complaint is the allegation that the defendant fed the Government "a steady stream of misinformation—primarily directed at [plaintiff]—to persuade it not to encourage competition". *See* Compl. ¶ 47. More specifically, plaintiff refers to: defendant's statements concerning the likelihood that plaintiff would not be able to qualify as a BSU–49 supplier in time for the 1985 contract; its statement of opinion that a sole-source relationship should be maintained in order to keep costs down; and its allegedly defamatory statements concerning plaintiff's "greed" and its unsatisfactory performance record. *See* Compl. ¶ 47. Plaintiff

---

**15.** The record is also devoid of any evidence that any company refused to do business with   plaintiff.

contends that the defendant's conduct in these regards was the proximate cause of the Army's failure to purchase BSU–49s from it in 1985 (when it submitted an unsolicited competitive procurement proposal), and its failure to exercise an option to renew plaintiff's 1985 interim contract. *See* Compl. ¶¶ 96, 108, 109.

Plaintiff has, however, offered no evidence to support its claim that any of defendant's alleged expressions of opinion were either incorrect or made in bad faith. As to causation, plaintiff has suggested no evidence that it was any of these alleged assertions which caused the Army to withhold business from plaintiff, and it is unlikely in the extreme that the Army bases its procurement decisions on what competitors say about each other.

### (6) Unnecessary Technology

■ The complaint alleges that defendant's representations concerning the benefit of altering the design of the ballute component of the BSU–49 constituted anticompetitive conduct. *See* Compl. ¶¶ 67–68. In particular, it claims that the defendant improperly sought to induce the Army to change the specifications of the BSU–49 to include a "braided" ballute component to make it more difficult for plaintiff, who did not possess the technology or machinery and tooling necessary to use this component, to enter this market. *See id.* at ¶¶ 67–69.

With respect to this, defendant was under contract with the Army to explore the feasibility and cost of possible new technology concerning the BSU–49 and plaintiff has produced no evidence to suggest that defendant's presentation of its research regarding the braided ballute was not a proper exercise of its contractual duty. However, even absent said contract, we note that neither inventing nor attempting to persuade others to employ your inventions constitutes anticompetitive conduct. As the court in *Berkey Photo* observed, "a monopolist is permitted and indeed encour-

aged, by [§ 2 of the Sherman Act] to compete aggressively on the merits, any success that it may achieve through 'the process of invention and innovation' is clearly tolerated by the antitrust laws". 603 F.2d at 263.

### Attempted Monopolization Claims

■ To recover on a claim of attempt to monopolize a private plaintiff must demonstrate: (1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; (3) a "dangerous probability" that the attempt will succeed; and (4) injury to its business or property by reason of the anticompetitive conduct. *International Distribution Centers, Inc. v. Walsh Trucking* (2d Cir.1987) 812 F.2d 786, 790, *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); 15 U.S.C. § 15. As the foregoing discussion reveals, to the extent that plaintiff might be able to demonstrate that the defendant engaged in anticompetitive conduct, it suggests no evidence which could demonstrate that such conduct caused it injury.

### State Law Claims

The parties have also properly invoked our diversity jurisdiction. Accordingly we turn to plaintiff's state law claims.

The complaint alleges four such claims: (1) commercial defamation arising out of defendant's having "made false and malicious statements disparaging and defaming plaintiff's capabilities and reputation", Compl. ¶¶ 94–99; (2) breach of contract in that defendant "violated a data maintenance contract entered into with the Air Force by deliberately withholding from plaintiff the ... TDP related to the [BSU–49]", Compl. ¶¶ 100–106; (3) the tort of interference with prospective business relations in that defendant's "pattern of unlawful ... anticompetitive ... conduct ... tortiously interfered with [plaintiff's] business relationship with the Government", Compl. ¶¶ 107–113; and (4) a *prima facie* tort claim substantially identical to its claim of tortious interference with prospective business relations, Compl. ¶¶ 113–117. Only

the first three remain before us [16], and we address each in turn.

 With respect to the first and second, plaintiff's inability to establish the requisite elements have already been disposed of by the foregoing discussion. With respect to tortious interference, under New York law a plaintiff must demonstrate that the alleged tortfeasor's actions were motivated solely by a desire to inflict injury on the plaintiff to the exclusion of any desire to advance its own competitive interests. *See Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.* (2d Cir.1980) 614 F.2d 832. It is obvious that this prerequisite can not be met.

### CONCLUSION

Defendant's motion for summary judgement is granted in its entirety.

SO ORDERED.

---

**16.** In its brief in opposition, plaintiff informs that it no longer relies on its claim of *prima facie* tort.