**IRVIN INDUSTRIES, INC.,**
**Plaintiff–Appellant,**

v.

**GOODYEAR AEROSPACE**
**CORPORATION, Defendant–Appellee.**

No. 1070, Docket 91–9150.

United States Court of Appeals,
Second Circuit.

Argued March 11, 1992.

Decided Aug. 3, 1992.

Garret G. Rasmussen, Washington, D.C. (Lanny J. Davis, John L. Oberdorfer, Charles E. Talisman, Kenneth L. Glazer, Glenn T. Reynolds, Patton, Boggs & Blow; David J. Rasmussen, Schiavetti, Begos and Nicholson, New York City, of counsel), for plaintiff-appellant.

William D. Iverson, Washington, D.C. (Elliott Schulder, Covington & Burling, of counsel), for defendant-appellee.

Before: OAKES, Chief Judge,* ALTIMARI and WALKER, Circuit Judges.

OAKES, Chief Judge:

Irvin Industries, Inc. ("Irvin") appeals from a decision of the United States District Court for the Southern District of New York, Whitman Knapp, Judge, 774 F.Supp. 849, granting summary judgment to Goodyear Aerospace Corporation ("Goodyear") on Irvin's monopolization and attempted monopolization claims under section 2 of the Sherman Act, 15 U.S.C. § 2 (1988). The district court also granted summary judgment against Irvin on several other claims not at issue in this appeal. In rejecting Irvin's Sherman Act claims, which were predicated on predatory pricing, the district court reasoned that Irvin could not as a matter of law establish that Goodyear's conduct caused the loss Irvin suffered. We conclude, however, that Irvin's showing regarding the predatory nature of Goodyear's conduct does not preclude a trier of fact from finding causation with respect to the Sherman Act claims. Accordingly, we reverse and remand for further proceedings.

I.

Both Irvin and Goodyear are defense contractors who, at the time of the alleged predatory conduct, manufactured a product known as the BSU-49. Sold only to the government, the BSU-49 is a device attached to bombs dropped from low-flying aircraft. When the aircraft releases a bomb, the BSU-49 deploys and slows the bomb's descent to enable the aircraft to move beyond the bomb's fragmentation range before it explodes. The BSU-49 consists of two components: a ballute, which is part balloon, part parachute and operates as an aerodynamic decelerator; and a tailcone, which is a metal cylinder that connects the ballute to the bomb.

Goodyear first developed the BSU-49 under a research and development contract with the United States Air Force. In 1982, 1983, and 1984 the United States Army—which had assumed procurement responsibility for the BSU-49—awarded Goodyear sole-source, one-year contracts for the device. The contract price per unit received by Goodyear for each of those years was as follows:

| | |
|---|---|
| 1982 | $667.04 |
| 1983 | $558.00 |
| 1984 | $581.00 |

During these years, Irvin served as one of several subcontractors for Goodyear, manufacturing the ballute component of the BSU-49.

In 1984, however, Irvin decided to enter the market for the BSU-49 itself—a move that, if successful, would place Irvin in direct competition with Goodyear for Army contracts. After various difficulties, some allegedly attributable to Goodyear, Irvin submitted an unsolicited proposal to produce 36,000 BSU-49s in partial fulfillment of the Army's fiscal 1985 needs. Irvin's proposed price was $520 per unit. But the Army had already awarded the 1985 contract to Goodyear, again on a sole-source basis, at a price of $608 per unit for 86,004 units. Thus, the Army rejected Irvin's proposal.

Irvin then sued the government for the right to compete for the BSU-49 contracts. Irvin also lobbied Congress to enlist its support in persuading Army officials to hold a competitive procurement for this product. Ultimately, in 1985, the Army agreed to hold a competitive procurement

* After argument but before decision, Chief Judge Oakes became a Senior Circuit Judge.

for the selection of a second supplier for the BSU–49. Out of eight bidders, Irvin won this secondary contract for a limited number of BSU–49s with a bid of $398.

In 1986, Irvin and Goodyear bid for the Army's fiscal 1986 needs—approximately 62,000 BSU–49s. Irvin bid $376, down from its previous successful bid of $398. Goodyear, which had supplied the devices in 1985 at $608 per unit, reduced its price to $332 per unit and won the entire contract. Soon thereafter, Irvin filed this lawsuit, alleging *inter alia* that Goodyear had engaged in predatory pricing in connection with its $332 bid.

Note that notwithstanding the alleged price predation, Irvin remains in the BSU–49 business. It won subsequent competitive Army contracts at the following per unit prices:

| 1987 | $311 |
| 1988 | $326.50 |
| 1989 | $269 |

## II.

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Based on this rule, summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We examine the record *de novo* to determine whether the grant of summary judgment was appropriate. *Viacom Int'l Inc. v. Icahn,* 946 F.2d 998, 1000 (2d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1244, 117 L.Ed.2d 477 (1992). Accordingly, we must decide whether the district court properly concluded that Irvin failed to show sufficient facts that would enable it to prove causation with respect to its Sherman Act claims.

■ To make out a claim of monopolization under section 2 of the Sherman Act, the plaintiff must establish that (1) the defendant had monopoly power in the relevant market, *Berkey Photo, Inc. v. East-*

*man Kodak Co.,* 603 F.2d 263, 272–73 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); (2) the defendant engaged in anticompetitive conduct; *id.* at 273–75; and (3) "its injury was, in fact, caused by the defendant's violation of the antitrust laws." *U.S. Football League v. NFL,* 842 F.2d 1335, 1377 (2d Cir.1988); *see also Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 41 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). The act of predatory pricing supplies the anti-competitive conduct element of Irvin's monopolization action.

■ Predatory pricing is essentially a three-phase process which may be described as follows. First, a seller temporarily cuts his price with the intent of eliminating his competitors or deterring potential competitors from entering the market. Second, the damage to or discouragement of competitors enables the predator to create or maintain a monopoly. Third, the predator recoups revenues lost through the temporary price cut by charging higher, monopoly prices. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117 & n. 12, 107 S.Ct. 484, 493 & n. 12, 93 L.Ed.2d 427 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584 n. 8, 106 S.Ct. 1348, 1355 n. 8, 89 L.Ed.2d 538 (1986); *Northeastern Tel. Co. v. AT & T Co.,* 651 F.2d 76, 86 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). When a predatory pricing allegation is advanced soon after the price cut, the issue is whether that price cut is part of a predatory pricing scheme. The price cut may simply reflect the seller's efficiency or efforts to break into a competitive market. *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396, 1400 (7th Cir.1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990). Moreover, if the market structure renders recoupment of profits lost during the price cut phase difficult or risky, it may be unlikely that the seller's price cut is predatory. *See id.* at 1401.

■ In order to distinguish a predatory price cut from one motivated by hard competition, we have adopted the test set forth by Phillip Areeda and Donald F. Turner in their seminal 1975 article [1]: predatory pricing is presumed to occur when a seller prices below reasonably anticipated average variable cost. *Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.,* 845 F.2d 404, 407 (2d Cir.1988), *aff'd,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989); *Northeastern Tel. Co.,* 651 F.2d at 88.

■ In ruling on Goodyear's motion for summary judgment, the district court resolved disputed facts in Irvin's favor. With respect to the monopoly power element of Irvin's monopolization claim, the district court assumed that Goodyear had monopoly power from 1982 through 1985, largely because of the sole-source contracts it was awarded. On the anticompetitive conduct requirement, Irvin presented evidence before the district court, in the form of expert testimony by certified public accountant Leslie Leiper. Leiper testified that Goodyear's average variable cost per unit for the 1986 contract should have been between $367.16 and $378.82. From this evidence the district court concluded, for the purpose of ruling on the summary judgment motion, that Goodyear's bid of $332 was predatory. However, as to the requirement that injury be caused by the defendant's anticompetitive conduct, the district court found that Irvin could not as a matter of law establish causation and, accordingly, granted summary judgment to Goodyear.[2]

The district court reached its finding on causation by reasoning as follows. First, although Irvin's evidence regarding Goodyear's average variable cost for the BSU-49 rendered Goodyear's bid of $332 presumptively unlawful, pursuant to that same evidence any Goodyear bid above $367.16 would have exceeded average variable cost and would therefore be lawful. But a lawful Goodyear bid above $367 (yet below $376) would still have resulted in Irvin's loss of the contract, because Irvin bid $376. In other words, the unlawful nature of Goodyear's bid was not the but for cause of Irvin's loss of the contract.

■ We disagree with the district court's conclusion. Initially, note what Irvin is required to prove at trial. It must prove a causal connection between its injury (loss of the contract) and Goodyear's illegal conduct (submission of a predatory bid). Irvin can establish this causal connection by demonstrating that Goodyear's "conduct was a substantial or materially contributing factor" in its injury. *Litton Systems, Inc. v. AT & T Co.,* 700 F.2d 785, 823 n. 49 (2d Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969).

■ Irvin presented evidence that Goodyear's $332 bid was below average variable cost and, hence, presumptively predatory. Because we view the facts in the light most favorable to Irvin, we accept this evidence as true for the purpose of this appeal. Irvin also showed that Goodyear's $332 bid prevailed over Irvin's bid of $376. Therefore, because Goodyear's predatory bid won the contract for Goodyear, there exists an obvious and direct causal connection between Goodyear's conduct and the injury suffered by Irvin. Goodyear argues, however, that it would have won the contract anyway with a lawful bid between $367.16 and $376. But Goodyear did not submit such a bid. The possibility that it might have submitted a lawful bid, and, if so, the same damage might have resulted, cannot in and of itself negate causation as a matter of law. *See Lee-Moore Oil Co. v. Un-*

1. Phillip Areeda and Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 716-18 & 733 (1975).

2. The district court also used Irvin's inability to prove causation as the basis for granting summary judgment to Goodyear on Irvin's attempted monopolization claim.

*ion Oil Co. of California,* 599 F.2d 1299, 1302 (4th Cir.1979).[3]

Moreover, in light of Irvin's bid of $376, we cannot say that Goodyear would have won the contract with a non-predatory bid. Perhaps a court could find as a matter of law that Goodyear's predatory bid caused no loss if Irvin's bid was so high—$700, for example—that virtually any nonpredatory Goodyear bid would have resulted in Irvin's loss of the contract. But this scenario does not describe the facts of this case, because Irvin's bid was obviously well within a competitive range.

To win the contract with a lawful bid, Goodyear would have had to bid between $367.16 and $376. It remains unclear, however, what bid Goodyear would have submitted if it had not engaged in predatory conduct. A fact finder could rationally infer that absent predatory intent, a competitor would bid substantially above its lowest estimate of average variable cost in order to retain some prospect of profit. Indeed, Goodyear's own evidence in this case indicated that it bid $14 above its own estimate of average variable cost. Irvin's evidence indicated that Goodyear's average variable cost was $367.16. A lawful Goodyear bid that added $8.84 or more to this determination of Goodyear's average variable cost would have caused Goodyear to lose the contract. Therefore, viewing the facts in the light most favorable to Irvin, we cannot conclude that if Goodyear had submitted a lawful bid, that bid would have been low enough to deprive Irvin of the contract.

■ In sum, Irvin's causation evidence centered on a showing that Goodyear won the contract with a bid that we presume was predatory. Goodyear argues that this evidence is negated by the possibility that Irvin would have lost the contract anyway, *if* Goodyear had submitted a lawful bid and *if* that imaginary lawful bid had been below $376. We believe, however, that under the facts of this case the possibility that Irvin would have lost the contract anyway is too speculative to negate, as a matter of law, the causal link shown by Irvin. The

trier of fact should determine whether causation exists in the Sherman Act claims, because Irvin made a showing sufficient to establish that Goodyear's conduct was "a substantial or materially contributing factor," *Litton Systems, Inc.,* 700 F.2d at 823 n. 49, in Irvin's loss of the contract.

Reversed and remanded for further proceedings consistent with this opinion.

---

**3.** In *Lee–Moore,* the court held that if the plaintiff could show damages resulting from the defendant's unlawful refusal to deal, "the fact that [the defendant] might have caused the same damages by a lawful cancellation of the contract is irrelevant." *Id.* at 1302.