**IRVIN INDUSTRIES, INC., Plaintiff,**

v.

**GOODYEAR AEROSPACE
CORPORATION,
Defendants.**

**No. 86 Civ. 8402 (WK).**

United States District Court,
S.D. New York.

Oct. 21, 1992.

Lanny Davis, Garret Rasmussen, Patton, Boggs & Blow, Washington, D.C., for plaintiff.

William D. Iverson, Covington & Burling, Washington, D.C., for defendants.

OPINION AND ORDER

WHITMAN KNAPP, SENIOR District Judge.

On October 1, 1991, I granted summary judgment in favor of defendant Goodyear Aerospace Corporation (hereinafter "Goodyear") *Irvin Industries v. Goodyear Aerospace Corp.* 774 F.Supp. 849. On August 3, 1992 the Court of Appeals reversed that decision and remanded for further proceedings "consistent with this opinion." *Irvin Indus. v. Goodyear Aerospace Corp.,* 974 F.2d 241, 241–46, 6091–6100. Familiarity with these opinions is assumed. Presently before me is a renewed motion for summary judgment on the ground that plaintiff was in no way harmed by the unlawful aspect of Goodyear's bid, the ground upon which the motion was originally granted but which—it is contended—the Court of Appeals did not consider. Before this renewed motion may be entertained, it must clearly appear that the Court of Appeals did not pass upon the now reasserted ground. For reasons that follow, I determine that it does clearly so appear and—having reconsidered the merits of my original decision—grant the instant motion.

BACKGROUND

The crux of my original decision may briefly be restated as follows: Goodyear's bid of $332 can accurately be described as having two separate aspects: (1) because it was less than $376 (three hundred and *seventy-six*), it was lower than plaintiff's; and (2) because it was less than $367.16 (three hundred and *sixty-seven*), it is presumed to be unlawful. The second aspect had nothing whatever to do with plaintiff's loss of the contract. Plaintiff was therefore in no way injured by any *unlawful aspect* of Goodyear's bid.

My reading of the Court of Appeal's Opinion convinces me that the Court did not pass upon that proposition. Instead it focused on—and rejected—an argument by Goodyear that, assuming that harm could have resulted from its presumably unlawful bid, such harm had been neutralized by the high probability (amounting to substantial certainty) that, had Goodyear been

alerted to the facts that made its bid unlawful, it would have responded with a lawful one and still won the contract. In a conference held on September 3, I advised the parties of my above stated belief. There ensued discussion as to what, if any, corrective proceedings might be appropriate (see Conference Minutes, pp. 1–45).

Two questions are now before me: First, do I correctly read the Court's Opinion as having neither considered nor rejected my above stated ruling? And, if so, was that ruling correct? Plaintiff in its "Memorandum in Opposition to Renewed Summary Judgment" addresses only the first of these questions. I shall address both.

I

It will be recollected that the plaintiff's expert accountant, Leslie A. Leiper, testified that in his opinion any Goodyear bid of less than $367.16 would have been predatory. I ruled that, in a summary judgment context, such testimony must be accepted as "gospel." However—as above indicated—I also ruled that since plaintiff's bid had been $376, plaintiff could in no way have been injured by the circumstance that Goodyear's bid fell below Leiper's estimate. In the course of that ruling, I observed (774 F.Supp. at 855):

> Plaintiff's own expert's testimony—which we have accepted as true—is that any bid for the 1986 contract at or above $367.16 would have been lawful.

My intention in citing plaintiff's "own expert's testimony" was to highlight the harmless nature of the presumed unlawful aspect of Goodyear's bid. I now realize that it could be—as indeed it was—interpreted to suggest that Goodyear could by subsequent conduct rectify any harm that might have resulted from the presumed unlawfulness of that bid. Counsel so interpreted my ruling, and tried to sustain it by persuading the Court that Goodyear's subsequent conduct would most certainly have consisted of a bid that met Leiper's standard, but was nonetheless lower than plaintiff's. Counsel never mentioned my actual ruling that the unlawful aspect of Good-

year's bid had never in the first place been harmful to the plaintiff.

It seems to me beyond cavil that a reading of the Court's opinion demonstrates that it in no way considered my actual ruling. On the contrary, it accepted counsel's interpretation and concentrated on the question of whether or not, as so interpreted, it could be sustained by the argument that whatever harm may have resulted from the presumably unlawful bid had been neutralized by the high probability (amounting to practical certainty) of Goodyear's hypothetical filing of a subsequent bid that would meet Leiper's standard. In describing the reasoning of my decision, the Court observed (974 F.2d at 245):

> The district court reached its finding on causation as follows. First, although Irvin's evidence regarding Goodyear's average variable cost for the BSU–49 rendered Goodyear's bid of $332 presumptively unlawful, pursuant to that same evidence any Goodyear bid above $367.16 would have exceeded average variable cost and would therefore be lawful. But a lawful Goodyear bid above $367 (yet below $376) would still have resulted in Irvin's loss of the contract, because Irvin bid $376. In other words, the unlawful nature of Goodyear's bid was not the but for cause of Irvin's loss of the contract.

Two paragraphs later, the Court continued (id., at 245–46):

> But Goodyear did not submit such a bid. The possibility that it might have submitted a lawful bid, and if so, the same damage might have resulted, cannot in and of itself negate causation as a matter of law.

The Court further observed (id., at 246) (emphasis supplied):

> A fact finder could rationally infer that absent predatory intent, a competitor would bid substantially above its lowest estimate of average variable cost in order to retain some prospect of profit.

That sentence, it seems to me, conclusively proves that the Court had been misled by Goodyear's arguments. The fact of the matter is that there was not a scintilla of evidence before the Court to suggest

that Goodyear had acted with "predatory intent."[1] The record was replete with evidence of its good faith efforts to make a lawful bid which turned out, according its own estimates, to be $14 above its average variable costs. However, the rules governing summary judgment required that Leiper's testimony be taken as "gospel," from which it necessarily followed that Goodyear was deemed to have made a mistake. But the mere fact that Leiper had a different opinion than Goodyear's own accountants could not in any way suggest unlawful intent on Goodyear's part.

When I expressed this thought at the conference, plaintiff's counsel replied that the Professors Areeda's and Turner's seminal article established that predatory intent was presumed from predatory pricing (Conference Minutes, at 26). There is no indication of such a suggestion in the article. What the article does say is that anything below average variable cost would be "conclusively" presumed to be predatory (Areeda & Turner at 733). This is the precise opposite of an implied intent.[2] Plaintiff also urged that there existed arguments about intent it could have made but had decided not to advance (Conference Minutes, at 27). One can only guess what these arguments might have been, but surely the Court was not influenced by arguments that could have been—but were not—made.

We are therefore left with only one explanation for the Court's misunderstanding in this regard: the negative pregnant emanating from Goodyear's entire argument. By insistently urging that it could by subsequent action cure the defect in its presumably unlawful bid, Goodyear ultimately

lead the Court to assume—contrary to fact—that it was admitting having had "predatory intent" in making that bid.[3]

Be that as it may, were there any doubt about what the Court was or was not considering, it would appear to have been dispelled by the conclusion of its penultimate paragraph (974 F.2d at 246).

> A lawful Goodyear bid that added $8.84 or more to this determination of Goodyear's average variable cost would have caused Goodyear to lose the contract. Therefore, viewing the facts in the light most favorable to Irvin, we cannot conclude that if Goodyear had submitted a lawful bid, that bid would have been low enough to deprive Irvin of the contract.

In brief, I conclude that the Court did not pass upon, and therefore could not have rejected, my ruling that—regardless of what Goodyear might or might not have done after submitting its bid—the presumably unlawful aspect of that bid had no effect on the plaintiff. From this it would follow that I am free to revisit the accuracy of my original decision without doing anything inconsistent with the Court's opinion. *See Bertha Building Corp. v. National Theatres Corp.* (2nd Cir.1959) 269 F.2d 785, 787–8 (District Court reversed for not entertaining defendant's motion for summary judgment on a ground which could have been—but was not—considered on a previous appeal, when such motion "raises a question of law only which, if sustained, would prevent the necessity of a jury trial"); *see also* Judge Rubin's decision in *Doran v. Petroleum Management Corp.* (5th Cir.1978) 576 F.2d 91.

---

**1.** Whether or not Goodyear acted with predatory intent is irrelevant to whether or not plaintiff was injured by the unlawful aspect of Goodyear's bid. This discussion is intended solely to illustrate how the Court was misled by the arguments before it.

**2.** In its current memorandum, the plaintiff somewhat strangely adds the following citation (p. 7, n. 6, emphasis supplied): *See also* VII P. Areeda, *Antitrust Law,* § 1506 at 390 (1987) "(A price that is clearly predatory will be condemned *no matter how sincere the defendant's belief* that he was promoting competition.)"

**3.** The phenomenon "negative pregnant," we are told by Judge McLaughlin, has plagued the judiciary since "before Columbus discovered America." *U.S. v. Pilot Petroleum Assc., Inc.,* (E.D.N.Y.1988) 122 F.R.D. 422, 423 n. 1. It has been commonly described as a denial which "leaves the answer pregnant with the affirmative admission that the material part of the allegation is true." *See e.g. Hall & Lyon Furniture Co. v. Torrey* (3rd Dept.1921) 196 A.D. 804, 806, 188 N.Y.S. 486. The instant case aptly illustrates that phenomenon.

Plaintiff's memorandum does not directly discuss my above analysis (which was suggested at the conference of September 3, see Conference Minutes at 2–4) but in various ways disagrees with its conclusion. However, at the conference (Conference Minutes at 3), counsel did cite one sentence in the Opinion which, standing by itself, could be construed as supporting plaintiff's theory of what the Court actually decided (974 F.2d at 245):

> Therefore, because Goodyear's predatory bid won the contract for Goodyear, there exists an obvious and direct causal connection between Goodyear's conduct and the injury suffered by Irvin.

That sentence, however, is immediately followed by one clearly designed to refute Goodyear's argument about possible hypothetical bids (974 F.2d at 245):

> Goodyear argues, however, that it would have won the contract anyway with a lawful bid between $367.16 and $376. But Goodyear did not submit such a bid.

This sequence confirms my belief that my confusing sentence and Goodyear's consequent appellate strategy prevented the Court from considering, much less rejecting, the actual basis for my decision. Of course, in the final analysis, it is only the Court whose decision we are discussing that can tell us whether my or plaintiff's interpretation is correct.

## II

The inquiry basic to a determination whether or not I was correct in my decision that plaintiff had suffered no harm from the presumptively unlawful aspect of Goodyear's bid is: What did the Second Circuit mean when in *U.S. Football League v. NFL* (2d Cir.1988) 842 F.2d 1335, 1337 it ruled that "to recover treble damages … an antitrust plaintiff must prove that its injury was, in fact, caused by the defendant's violation of the antitrust laws"?[4]

In considering this question, we start with the proposition that any tort plaintiff must establish that the injury of which it complains was caused by some activity attributable to the defendant. It would seem to follow that the only purpose the *NFL* court could have had in announcing its above ruling was to make clear that a treble damage antitrust plaintiff has the additional burden of identifying the exact manner in which it's injury can, in fact, be traced to that part of defendant's activity which constituted an antitrust violation. Applied to the facts at bar, since plaintiff's chance of winning the contract was lost as soon as Goodyear's bid got below $376, plaintiff was in no way injured by the circumstance that the bid went sufficiently lower so that, according to Leiper, it became unlawful.

Justice Marshall's opinion for an unanimous Court in *Brunswick v. Pueblo Bowl-o-Mat* (1977) 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 echoes the *NFL* ruling in observing that an antitrust treble damage plaintiff must establish that its claimed damages flowed "from that which makes defendant's acts unlawful" (*Id.*, at 489, 97 S.Ct. at 697). That opinion also adds the requirement that the claimed injury must be "of the type the antitrust laws were intended to prevent" (*Id.*). With respect to this added requirement, given the axiomatic wisdom that it is the purpose of antitrust laws to foster competition rather than to protect competitors (*see e.g. Atlantic Richfield v. USA Petroleum Co.* (1989) 495 U.S. 328, 338, 110 S.Ct. 1884, 1891, 109 L.Ed.2d 333), it would seem that the purpose of these laws in a situation such as this would be to enable more (or equally) efficient outsiders successfully to compete with a monopolist by underbidding its average variable costs. If this be so, the injury sought to be prevented would be the frustration of that purpose by a monopolist's submission of a predatory bid. In the instant case, since plaintiff's bid was higher than the figure Leiper's testimony had established as permissible for Goodyear, plaintiff could not have been injured by "that which" made Goodyear's bid presum-

---

**4.** The Court of Appeals has recognized the general applicability of the *NFL* decision (974 F.2d at 244). However, if I have correctly read (*supra*, at 951–54) its Opinion, it could not have considered whether or not *NFL* supports my specific ruling.

ably unlawful, namely its descent below that figure.

Although the foregoing considerations would seem to establish that the facts at bar come under the general umbrella of the cited rulings, it must be recognized that neither of the cited cases deals with facts remotely similar to those at bar. Indeed no one—either counsel for the parties or my chambers—has been able to find a case with facts even vaguely resembling those at bar which—as we have seen—involve a plaintiff who (1) loses a contract because it was underbid by $44 a unit (or a total of $2,755,659) [5], (2) hires an expert to come up with the highest possible figure that could be claimed to be the winning firm's non-predatory bid, and then (3) sues for treble damages even though its own bid was $9 a unit higher than the figure it had thus obtained from its own expert.

With no case exactly on point, one must look to a general understanding of antitrust law to determine whether or not there is any reason why the cited rules should not apply to this particular treble damage plaintiff. In this circuit at least, such an inquiry would begin—and probably end—with Professors Areeda's and Turner's seminal article.[6]

In this article, the authors examined various aspects of the law of predatory pricing. One of their concerns was to avoid suggesting any rule which would either (1) materially deter rather than foster meaningful competition or (2) subject competing firms to unnecessary risk of expensive litigation.

In the introductory portion of the article, after observing that "proven cases of predatory pricing have been extremely rare," they offer the following admonition (Areeda & Turner, at 699):

> That predatory pricing seems highly unlikely does not necessarily mean that there should be no antitrust rules against it. But it does suggest that extreme care be taken in formulating such rules, lest the threat of litigation, particularly by private parties, materially deter legitimate, competitive pricing.

Further into the article, after discussing—and deciding against—the advisability of prohibiting "marginal cost pricing," the authors observe (Areeda & Turner, at 711):

> To hold the monopolist responsible, after-the-fact, for reasonable miscalculations would be an intolerable burden, and encourage a high price policy in order to be safe.

Lastly, after a discussion under the heading "average variable cost as a surrogate for marginal cost," the authors offer the following general observation (Areeda & Turner, at 718):

> Moreover, given the relatively rare occurrence of predatory pricing, we believe that a slightly permissive rule is acceptable since the threat of litigation under any rule on predatory pricing is more likely to discourage proper pricing than predation, and the benefit of any doubts should go toward protecting the seller, instead of increasing his vulnerability.

The logic of these thoughts compel the rejection of plaintiff's suggested theory of liability. Had the authors been thinking of the very facts here at bar, nothing could more accurately have described the instant situation than their statement that to "hold the monopolist responsible, after the fact, for reasonable miscalculations would be an

---

**5.** The contract called for 62,628 units, see Chermak Deposition Exhibit 300.

**6.** Phillip Areeda and Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975). Aside from the Court's opinion in the instant case (slip, at 6096–7), this seminal article has been cited in the following decisions of the Supreme Court, the Court of Appeals and district courts within this circuit. *Atlantic Richfield v. USA Petroleum* (1990) 495 U.S. 328, 346, 110 S.Ct. 1884, 1895, 109 L.Ed.2d 333; *Cargill v.*

*Monfort* (1986) 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427; *Matsushita v. Zenith* (1986) 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538; *Northeastern Tel. Co. v. A.T. & T.* (2d Cir.1981) 651 F.2d 76; *Buffalo Courier v. Buffalo Evening News* (2d Cir.1979) 601 F.2d 48; *Energex v. North Amer. Philips* (S.D.N.Y.1991, Motley, J.) 765 F.Supp. 93; *Energex v. North Amer. Philips* (S.D.N.Y.1987, Kram, J.) 656 F.Supp. 914; *Gemini v. Zeitlin* (E.D.N.Y.1984, Platt, J.) 590 F.Supp. 153; *Northeastern Tel. Co. v. A.T. & T.* (1980 Dist.Conn., Eginton, J.) 497 F.Supp. 230.

intolerable burden, and *encourage a high price policy in order to be safe.*" Should plaintiff's theory of the law prevail, any firm that might in the future find itself in Goodyear's position would—in order to protect itself from potentially ruinous litigation—bid a price high enough not only to cover its own estimate of average variable costs, but also to cover any possible figure a competitor's "hired gun" accountant might suggest. Any competitor, knowing the difficulties under which the Goodyear-like firm would be operating, would calculate its bid accordingly. It seems unlikely that the Congress had any such objective in mind when it designed the antitrust laws as a "consumer welfare prescription." [7] *See Reiter v. Sonotone Corp.* (1979) 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931.

As above indicated, plaintiff's memorandum in opposition to the instant motion advances no argument as to the correctness or error of my original decision. This is a disappointment. At our September 3 conference, plaintiff complained that it had been prevented from fully expressing its views (Conferences Minutes, at 15). Hoping to remedy this, on the following day I addressed a letter to counsel advising them of my inclination to grant defendant's motion and urging them to submit memoranda explaining their positions. Having failed to get from plaintiff any memorandum on the merits, I shall deal with the arguments its counsel advanced at the conference.

Counsel there made two basic contentions: (1) *Lee–Moore Oil Co. v. Union Oil Co. of California* (4th Cir.1979) 599 F.2d 1299, 1302 completely defeats defendant's motion (Conference Minutes, at 17); and (2) standards applicable to government bidding should be different than those applicable to commercial bidding because the law requires the government to accept the lowest bid regardless of what its preference might be (Conference Minutes at 40–42).

The *Lee–Moore* argument can be readily discarded. Counsel stated his understanding of the *Lee–Moore* rule as follows (Conference Minutes, at 17):

> What *Lee–Moore* says is that you can't reconstruct the conduct to say if the low bidder had bid higher, it could have still been legal; therefore, no causation. That's our view of *Lee–Moore* and that is exactly what the Court of Appeals ruled.

I agree with that statement of the rule. I also agree that as so stated the rule defeats the argument Goodyear advanced on appeal, namely, that its likely subsequent conduct could have rendered harmless any injury caused by its original bid. However, as so stated, *Lee–Moore* sheds no light on the question of whether or not I correctly ruled that plaintiff had not in the first place been injured by the unlawful aspect of that bid.

With respect to the second point, about the government being compelled to accept Goodyear's bid, the logic of this argument escapes me. The fact that the government (or any other entity) might be compelled to accept the lowest bid can in no way influence the determination of whether or not plaintiff's injury was caused by "that which" made a defendant's bid unlawful. Moreover, plaintiff does not suggest any policy reason why different standards should apply to government than to commercial bidding. For example, plaintiff points to no evidence suggesting that in the instant case the government, had it been free to do so, would have considered rejecting defendant's bid in favor of plaintiff's and thus increasing its own expenditures by almost three million dollars. Nor does plaintiff cite any statistics suggesting that, in commercial bidding, firms reject the lowest bid in sufficient numbers to require a different rule for governmental as opposed to commercial bidding.

7. For example, let us assume that plaintiff's theory had been judicially established before the bidding in this case, and that Goodyear had attempted to apply it. As the Court of Appeals observed in its Opinion, that might or might not have helped plaintiff. It would, however, most certainly have cost the government at least an additional $2,201,973 (the difference between Goodyear's bid of $332 per unit and Leiper's $367.16 estimate of the lowest unit price Goodyear could legally have bid).

## CONCLUSION

Having concluded that the Court of Appeals did not rule upon, and therefore could not have rejected, the basis of my original decision, and having reconsidered that decision, I grant Goodyear's motion to dismiss the complaint.

SO ORDERED.